UNITED STATES of America, Plaintiff-Appellee,

v.

Michael R. BENNETT, William G. Bennett, Anastasio Cervantes, Eydler Castellano, Maximo Hildo Feijo-Garcia, Defendants-Appellants.

No. 86–5861.

United States Court of Appeals, Eleventh Circuit.

July 7, 1988.

---

[**] Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

J. Brian Brennan, West Palm Beach, Fla., Milton Hirsch, Miami, Fla., for Bennetts.

Donnie Murrell, Adler & Murrell, West Palm Beach, Fla., for Cervantes.

James L. Eisenberg, Green, Eisenberg & Cohen, West Palm Beach, Fla., for Castellano.

Leon B. Kellner, U.S. Atty., Miami, Fla., Robert B. Cornell, Andrea M. Simonton, Linda Collins Hertz, Asst. U.S. Attys., Ft. Lauderdale, Fla., for plaintiff-appellee.

Theodore J. Sakowitz, Federal Public Defender, Miami, Fla., Miguel Caridad, Asst. Federal Public Defender, for Feijo-Garcia.

Before FAY and VANCE, Circuit Judges, and HOFFMAN *, Senior District Judge.

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

VANCE, Circuit Judge:

This case arises out of the authorities' seizure of over 750 kilograms of cocaine. Appellants were each convicted of one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and one count of conspiracy to commit that offense in violation of 21 U.S. C. § 846. Following their convictions all five appellants brought this appeal raising various points of error. We affirm.

## I.

On the morning of October 30, 1985 a most peculiar series of events occurred on the grounds of "Montsorrel," a large oceanfront estate in Palm Beach. Shortly after sunrise Thomas Basile, the estate's caretaker, encountered three men walking on the property. The men were soaking wet and covered with sand. According to Basile the men "looked like they just came out of the ocean." After telling the men to get off the property Basile called the police.

When the police arrived they noticed an unoccupied three-seat ocean racer about fifty yards offshore. On the beach they observed various items, including a life jacket, swim fins, shoes and a locked canvas duffel bag that had been cut open. As one of the officers peered at the unoccupied boat through binoculars, he noticed another boat approaching from the southeast. As the boat drew closer the officers were able to see that it was occupied by two white males, one older than the other. When the boat had moved to within about thirty yards of the unoccupied vessel, the younger of the two men picked up a pair of binoculars and began to stare at the unoccupied vessel. Shortly thereafter the man trained his binoculars on the shoreline where uniformed officers were standing in plain view. Almost immediately the boat turned sharply and headed back toward the southeast at the high rate of speed. The officers on the scene contacted aerial units of the Palm Beach County Sheriff's office which proceeded to track and pursue the fleeing vessel.

At that point officers swam out to the unoccupied vessel and found thirty-two duffel bags containing more than 750 kilograms of cocaine. At about the same time three men fitting the description Basile had given police were being detained a short distance from the estate. The men had been "pretending" to jog down the road when they were stopped by police.[1] After Basile arrived and positively identified the men, they were arrested and later identified as appellants Eyder Castellano, Anastasio Cervantes and Maximo Feijo–Garcia.

In the meantime the authorities had managed to stop the fleeing boat, which had sped about twenty-five miles at almost fifty miles an hour—its maximum speed. Manning the boat were appellants William and Michael Bennett. Upon being stopped William Bennett exclaimed, "I don't know why they stopped me. We were just going fishing." When authorities searched the boat, however, they found no fishing equipment. Instead they found a loaded handgun, an AR–15 semi-automatic rifle, plastic baggies and $110,790 in cash hidden in a panel in the boat's cabin.

The Bennetts were arrested and placed in a holding cell with other prisoners. Roger Furbee was one of those prisoners. Furbee testified that he and the Bennetts discussed cocaine. When Furbee told the Bennetts that he had been involved in cocaine transactions of four to eight hundred pounds, Michael Bennett stated, "That's not a lot of cocaine." In addition, William Bennett expressed concern over how he was going to explain that he was fishing with over $110,000 in his boat. According to Furbee, William Bennett told his son that the best thing they could say was that they were trying to render assistance to the other boat.

Back in Palm Beach Cervantes, Feijo–Garcia and Castellano were being questioned. Cervantes and Feijo–Garcia stead-

---

1. The trio did not appear to be typical Palm Beach joggers. All three men were wet and covered with sand. Cervantes was in his bare feet, holding a pair of sandals while Castellano was running in socks only half on his feet.

fastly maintained that they did not know anything about a boat, and that they had simply been "out for a stroll" when detained by police.[2] Castellano, however, told a different story. He gave a full confession, describing how he, Cervantes and Feijo–Garcia had picked up the cocaine on an island. Castellano described the island in some detail and told of a mother ship with people working on it. Castellano also led authorities back to the estate and showed them where an additional twenty-nine kilograms of cocaine were hidden.

All five appellants were indicted on one count of possession with intent to distribute cocaine and one count of conspiracy. They were tried jointly, with Castellano's confession being introduced in evidence. Appellants were each convicted on both counts. This appeal followed.

## II.

## A.

We first address the Bennetts' contentions. The Bennetts argue: (1) that the court erred in admitting evidence of William Bennett's prior drug smuggling activity, and (2) that the evidence was insufficient to support their convictions.

▮ At trial the government introduced in evidence William Bennett's 1986 conviction for conspiracy to import and conspiracy to possess with intent to distribute methaqualone. The government introduced evidence that Bennett's role in the conspiracy had been to find an airstrip and assemble an offload crew. The government also introduced evidence of William Bennett's involvement in a 1980 scheme to import cocaine from the Bahamas. The Bennetts contend that this evidence was inadmissible under Rule 404(b) of the Federal Rules of Evidence and that any probative value it had was outweighed by the danger of unfair prejudice. We disagree.

The standard governing the admissibility of evidence of prior bad acts is well settled:

First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice....

*United States v. Nabors,* 707 F.2d 1294, 1300 (11th Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1271, 79 L.Ed.2d 677 (1984) *(quoting United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (in banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)); *see* Fed.R.Evid. 403, 404(b). The determination of whether extrinsic offense evidence meets this two-part test is a matter within the district court's discretion, and the court's decision to admit such evidence will not be upset on appeal absent an abuse of that discretion. *United States v. Dothard,* 666 F.2d 498, 501 (11th Cir.1982).

At trial the Bennetts' defense was that they had simply taken their boat out to do some fishing and diving in the Bahamas or Florida Keys. They testified that the only reason they pulled up to the drug laden vessel was that they were concerned for the safety of anyone who might have been aboard. Seeing that the boat was unoccupied, they decided to leave.

Given the Bennetts' explanation of their activities, intent became the central issue in the case. The extrinsic offenses admitted in evidence both involved the intent to import and distribute illegal narcotics. The fact that William Bennett had engaged in narcotics smuggling on other occasions certainly makes it less likely that his intentions were innocent in this instance. *Beechum,* 582 F.2d at 911; *see also United States v. Ospina,* 823 F.2d 429, 433 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1232, 99 L.Ed.2d 432 (1988); *United States v. Dorsey,* 819 F.2d 1055, 1060 (11th Cir.1987). Accordingly, the evidence of William Bennett's prior drug-related of-

---

**2.** The address on Feijo–Garcia's driver's license matched the address for one "Avelino Suengas," the registered owner of the cocaine laden vessel. In addition, a United States Customs investiga-

tor had met with Castellano one week before and obtained Castellano's permission to search the vessel.

fenses was relevant to the issue of his intent. Because the evidence was relevant to intent, it was admissible under Rule 404(b).

■ Even if evidence of prior bad acts is relevant to an issue other than the defendant's character, it cannot be admitted if it is unduly prejudicial. Rule 403 allows a court to exclude otherwise relevant evidence if its probative value is *substantially* outweighed by the danger of unfair prejudice.

In this case the probative value of the extrinsic offense evidence was substantial. As we noted earlier, intent was the central issue in the case against the Bennetts. Because the government did not have overwhelming evidence connecting the Bennetts to the conspiracy, the extrinsic offense evidence was an important aspect of the government's case against William Bennett. The evidence was especially probative in light of the Bennetts' "mere presence" defense. In addition, the two prior offenses were quite similar to the one involved here. In both instances William Bennett had been involved in a scheme to import narcotics into the United States.

Turning to the other side of the Rule 403 balance, we cannot say that the extrinsic offense evidence presented a significant danger of unfair prejudice. The offenses involved were " 'not of a heinous nature, likely to incite the jury to an irrational decision.' " *United States v. Tunsil*, 672 F.2d 879, 881 (11th Cir.), *cert. denied*, 459 U.S. 850, 103 S.Ct. 110, 74 L.Ed.2d 98 (1982) (*quoting United States v. McMahon*, 592 F.2d 871, 876 (5th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979)). In addition, the court twice instructed the jury that it should consider the evidence only for the limited purpose of establishing William Bennett's state of mind. We therefore conclude that the evidence of William Bennett's prior drug smuggling activity was admissible under Rule 403, and that the district court correctly admitted it.

The Bennetts also challenge the sufficiency of the evidence to support their convictions. We cannot reverse a conviction on this ground unless after reviewing the evidence in the light most favorable to the government we conclude that no reasonable trier of fact could find proof of guilt beyond a reasonable doubt. *United States v. Montes-Cardenas*, 746 F.2d 771, 778 (11th Cir.1984). "The evidence may be sufficient though it does not 'exclude every reasonable hypothesis of innocence or [is not] wholly inconsistent with every conclusion except that of guilt....' " *Id.* (*quoting United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (in banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

■ There was ample evidence to support the Bennetts' convictions. The Bennetts, riding in a boat loaded with weapons and over $110,000 in cash, pulled up near an unoccupied vessel containing over 750 kilograms of cocaine. Michael Bennett began to peer at the cocaine laden vessel through a pair of binoculars. After Michael Bennett turned the binoculars toward the shoreline where uniformed police officers were standing, the Bennetts' boat turned sharply and took off at a high rate of speed in the direction from which it had come. From this evidence, a jury might reasonably conclude that the Bennetts had come looking for the cocaine laden boat, only to be forced to flee by the presence of the authorities. This is especially true in light of the evidence of William Bennett's prior drug smuggling activities.

The government introduced other evidence tying the Bennetts to the conspiracy. Following the Bennetts' arrest, authorities searched William Bennett's home and found over fifty firearms, a triple balance beam scale, bulletproof vests, a scanner with a list of law enforcement frequencies and devices used to detect electronic surveillance. The fact that William Bennett owned these items casts substantial doubt on his assertion that he earned his living as a professional poker player. The testimony of several of William Bennett's neighbors was even more revealing. Three persons who either lived or worked near the Bennett residence testified that in the months before William Bennett's arrest they had seen him with a boat that resembled the cocaine laden vessel. Indeed, one

witness positively identified the cocaine vessel as one he had seen docked by William Bennett's house. The witness saw the boat at least twice, and wondered "why ... a boat of this size with three engines in the back [was] in this little lagoon." [3]

Finally, the jury could have inferred guilt from the Bennetts' own explanations of their activities. When first stopped William Bennett stated that he was simply going fishing. An exhaustive search of the boat, however, turned up no fishing equipment. At trial both Michael and William Bennett testified that they had taken the boat out intending to go to the Bahamas or Florida Keys for "recreational" purposes. Although neither of the Bennetts had done any boating in those waters, no maritime charts or maps were found. Instead, authorities found an aeronautical map with signals for radio frequencies.[4] As for the presence of $110,790 in cash, William Bennett testified that he was a professional gambler and that he kept the money hidden in the boat because its presence in the house might endanger his wife.

By choosing to present a defense the Bennetts incurred the risk that they might bolster the government's case. Indeed, this court has held that a defendant's implausible explanation may constitute positive evidence in support of a jury verdict. *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir.1984). Here, the Bennetts' explanation of their activities was dubious, if not wholly incredible. A reasonable jury might well disbelieve the explanation and conclude that the Bennetts were lying in an attempt to cover up illegal activities.

We recognize that the evidence against Michael Bennett is not as compelling as that against his father. The evidence, however, was sufficient to support the jury's verdict. The boat the Bennetts were using when arrested was registered to Michael Bennett. It was Michael Bennett who was watching the cocaine laden vessel so closely through his binoculars. It was Michael Bennett who scoffed at Roger Furbee's assertion that he had been in cocaine transactions of four to eight hundred pounds and stated: "That's not a lot of cocaine." [5] After considering this evidence along with the evidence outlined above, we conclude that there was ample evidence from which a reasonable jury might find both William and Michael Bennett guilty beyond a reasonable doubt.

### B.

We now turn to the issues raised by Cervantes, Castellano and Feijo–Garcia. Of the four issues raised by these appellants, only two merit discussion: (1) whether the court violated Castellano's and Cervantes' statutory and constitutional rights by failing to supply individual interpreters, and (2) whether Castellano's confession was admitted in evidence in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[6]

---

3. While in the holding cell with Furbee, William Bennett expressed concern that some of his neighbors might have seen the cocaine boat docked by his house.

4. The significance of the aeronautical map is apparent from the testimony of Sergeant Jules Barone of the Lake Park Police Department. On December 6, 1984 William Bennett's wife called the police to complain that a man had come to her home and told her that he had been hired to kill her husband. Sergeant Barone and other officers set up a surveillance of the Bennett residence which they maintained for two days. During that time Sergeant Barone spoke with William Bennett and asked him how he had become involved in such a situation. Bennett described how in the past he had acted as a "middleman for smugglers." In the course of this conversation Bennett mentioned that during smuggling operations he would fool the au-

thorities by using a mode of communication opposite to the mode of transportation. That is, if he was in a boat he would use aircraft frequencies; if he was in a plane he would use marine frequencies. On cross-examination William Bennett admitted that this was his mode of operation when engaged in smuggling activities.

5. To be sure, a number of different inferences can be drawn from such a statement. When reviewing a conviction for the sufficiency of the evidence, however, we must draw all reasonable inferences in favor of the jury's verdict. *United States v. Cole*, 755 F.2d 748, 755 (11th Cir.1985).

6. Castellano's contention that his confession was involuntary is without merit, as is Feijo's argument that the court erred by denying his motion to suppress Basile's pretrial identification.

Cervantes, Castellano and Feijo–Garcia speak only Spanish. Although Feijo–Garcia's court appointed attorney was fluent in Spanish, the attorneys appointed to represent Cervantes and Castellano were not. The court was aware of the appellants' inability to speak English and appointed a single interpreter to serve all three. The interpreter sat near the witness stand and provided translation by speaking into a microphone that fed into headsets worn by the three Hispanic defendants.

Cervantes and Castellano contend that the court erred by denying their request for individual interpreters. Although they admit that the translation provided by the single court-appointed interpreter enabled them to understand the proceedings, Cervantes and Castellano complain that the lack of individual interpreters prevented them from communicating with counsel during the course of the trial. They argue that the court's failure to appoint individual interpreters violated their rights under both the Court Interpreters Act, 28 U.S.C. §§ 1827–28, and the sixth amendment. We disagree.

The Court Interpreters Act was enacted in 1978 to require the federal courts to appoint interpreters in certain cases. The Act is triggered:

[I]f the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case), or a witness who may present testimony in such action—

(1) speaks only or primarily a language other than the English language; or

(2) suffers from a hearing impairment (whether or not suffering also from a speech impairment)

so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness'

comprehension of questions and the presentation of such testimony.

28 U.S.C. § 1827(d). Upon making such a determination the court must "utilize the services of the most available certified interpreter, or ... the services of an otherwise competent interpreter." *Id.*

■ We conclude that the district court's appointment of a single interpreter satisfied the requirements of the Court Interpreters Act. The Act clearly authorizes the use of a single interpreter in multidefendant cases. Section 1828(a) directs the Administrative Office of the United States Courts to establish a program to "provide a capacity for simultaneous interpretation services in multidefendant criminal actions...." The Act's legislative history is also revealing. The House Report states:

It is the committee's intent that all interpretations are to be made in the consecutive mode except in those limited situations where the court determines, and all the parties agree, that the simultaneous or summary mode will aid in the efficient administration of justice. *The use of simultaneous interpretation is authorized to deal with two situations:* first, in cases where the services of a manual (sign language) interpreter are to be utilized and, *second, in multidefendant criminal ... actions.*

....

Section 1828 of the bill authorizes the establishment of special interpretation services which shall be capable of providing simultaneous interpretation services in multidefendant criminal ... actions.

H.R.Rep. No. 1687, 95th Cong., 2d Sess. 7–8, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4652, 4658–59 (emphasis added).[7] Simply put, the method of translation used by the district court is the very method Congress envisioned in multidefendant cases when it passed the Court Interpreters Act.

7. "Simultaneous translation requires the language interpreter to interpret and to speak contemporaneously with the individual whose communication is being translated. No pauses by the individual are required.... Under the consecutive mode, the speaker, whose communica-

tion is being translated, must pause to allow the interpreter to convey the testimony given." H.R.Rep. No. 1687, 95th Cong., 2d Sess. 8 *reprinted in* 1978 U.S.Code Cong. & Admin.News 4652, 4658–59.

Cervantes and Castellano had ample opportunity to consult with their attorneys. From the outset of the trial the court was sensitive to appellants' predicament and offered to recess the proceedings at any time they needed to consult their attorneys through the interpreter. Appellants requested and received several such recesses. Indeed, appellants conceded at oral argument that at no time did the court deny a request by appellants' counsel to recess the trial and use the interpreter to communicate with their clients.

In essence, the appellants' interpretation of the Court Interpreters Act would require the appointment of two interpreters for each non-English speaking defendant— one to translate the proceedings, and one to translate any communication between the defendant and his attorney. Nothing in the Act imposes such a requirement. The method of translation the district court employed enabled Cervantes and Castellano to both understand the proceedings and communicate with their attorneys. Accordingly, the requirements of the Court Interpreters Act were satisfied.

■ Nor did the court's use of a single interpreter violate Cervantes' and Castellano's rights under the sixth amendment. As a constitutional matter the appointment of interpreters is within the district court's discretion. *See United States v. Tapia*, 631 F.2d 1207, 1209 (5th Cir.1980); *United States v. Martinez*, 616 F.2d 185, 188 (5th Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). Here, the court's use of the interpreter represented a proper balancing of appellants' "constitutional rights to confrontation and due process against the public's interest in the economical administration of criminal law." *Martinez*, 616 F.2d at 188.

Finally, we must determine whether the introduction of Castellano's confession constitutes reversible error under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton* the Supreme Court held that a defendant's sixth amendment right to confrontation is violated when the incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the court instructs the jury to consider the confession only against the codefendant. The Court questioned whether juries could follow such an instruction and concluded that the instruction was an insufficient substitute for a defendant's sixth amendment right of cross-examination. 391 U.S. at 132–37, 88 S.Ct. at 1625–29.

Cervantes and Feijo–Garcia contend that Castellano's confession was admitted in evidence in violation of *Bruton*. They argue that Castellano's confession directly implicated them as well, and that because Castellano was unavailable for cross-examination their sixth amendment right to confrontation was violated. Cervantes and Feijo also complain that the prosecutor urged the jury to accept Castellano's confession as evidence of their guilt during both his opening statement and closing argument.

At trial Castellano's confession was introduced through the testimony of Officer Muniz. The disputed portion of Officer Muniz's testimony is as follows:

Q: Did he tell you where he went to go to pick up the cocaine?

A: Yes. He didn't know the location but he described what the area looked like, and he described it as a rocky area with a lighthouse and a little house next to it, with a vessel parked in front at a dock.

. . . .

Q: What is that?

A: That is a drawing he made of the lighthouse with the little house next to it and on the other side is a picture of the vessel.

Q: The picture of which vessel?

A: The vessel where *they* unloaded the cocaine from.

. . . .

Q: Did he take you back to 548 North County Road to show you anything on the premises?

A: Yes, he did. He told me that there was cocaine hidden in some bushes and he took me back there, showed me where it was hidden.

Q: Did he tell you it had come off the boat?

A: The boat *they* were on, yes.

....

Q: If you can, describe what you're doing there and on what's on the ground there.

A: That's where Mr. Castellano took me back to and that's kilos of cocaine *they*—blocks of cocaine which were hidden in the hedges.

(emphasis added).

During his opening statement the prosecutor had stated:

Who are these three guys? That's these three guys. These three guys are hightailing it through the area and trying to get away.... Mr. Castellano concedes that he's got details about this, that he was involved in this transaction, and he brings police officers back to the area to show them where *they* had hidden and he had hidden 29 kilograms of cocaine that was taken from the vessel.

(emphasis added). During closing arguments the prosecutor again discussed Castellano's confession:

Castellano says something entirely different; and he tells us all about *them* going to pick the cocaine up[.]

(emphasis added). After a defense objection was overruled, the prosecutor returned to the same line of argument:

He tells the police officers about going out in this vessel picking up the cocaine from this mother vessel which is over near a lighthouse and then they brought the cocaine back in a speedboat and the

speedboat broke down and *they* fled the area.

(emphasis added).

■ We agree with appellants that the manner in which the government introduced Castellano's confession was erroneous. Although the government attempted to redact the confession to omit all references to the other appellants, the use of the pronoun "they" could most logically be understood to refer to Cervantes and Feijo–Garcia. *See United States v. Petit,* 841 F.2d 1546, 1556 (11th Cir.1988).[8] This is especially true in light of the prosecutor's opening statement and closing argument. Because Castellano's confession clearly implicated Cervantes and Feijo–Garcia, its admission violated those two appellants' sixth amendment right of cross-examination.

Although the district court erred in its admission of Castellano's confession, it does not follow that appellants' convictions must be reversed. It is well settled that *Bruton* errors are subject to the harmless error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Cruz v. New York,* —— U.S. ——, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987); *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1058, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *Petit,* 841 F.2d at 1556–57; *United States v. Gutierrez-Chavez,* 842 F.2d 77, 80–81 (5th Cir.1988). As the Supreme Court explained in *Schneble:*

In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a rea-

---

**8.** In *Richardson v. Marsh,* —— U.S. ——, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987), the Supreme Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to her existence." (footnote omitted). The Court left open the question of the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun. 107 S.Ct. at 1709 n. 5.

We reject the government's contention that Castellano's confession was admissible under *Richardson* for two reasons. First, the district court did not give a "proper limiting instruction." 107 S.Ct. at 1709. Rather than instructing the jury at the time the confession was admitted to consider it only against Castellano, the court waited until its final instructions several days later. Second, the government's attempted redactation did not eliminate all references to appellants' existence. Far from being neutral, the pronoun "they" clearly referred to Cervantes and Feijo–Garcia.

sonable doubt that the improper use of the admission was harmless error.

405 U.S. at 430, 92 S.Ct. at 1059.

The properly admitted evidence against Cervantes and Feijo–Garcia was nothing short of overwhelming. Indeed, there can be no doubt whatever that Cervantes, Feijo–Garcia and Castellano were the three men that had abandoned the cocaine laden vessel. Basile positively identified the trio as the three men he had seen walking on the estate a short distance from where the boat was found. When arrested all three men were soaking wet and covered with sand. Although they pretended to be jogging, Cervantes was in his bare feet and Castellano was running in socks only half on his feet.[9] The address on Feijo–Garcia's driver's license matched the address of the cocaine vessel's registered owner. In addition, one week prior to appellants' arrest a United States Customs investigator had observed Castellano in possession of the boat. Finally, the jury heard testimony about how Castellano led authorities back to the estate and showed them where an additional twenty-nine kilograms of cocaine were hidden.[10]

■ When viewed in light of the case's 1200 page record and the overwhelming evidence of appellants' guilt, the *Bruton* violation was insignificant. The error was regrettable, but we cannot imagine that it affected the jury's verdict. Accordingly, we conclude that the error was harmless under *Chapman.*

### III.

None of the five appellants has demonstrated reversible error. Their convictions are therefore

AFFIRMED.

9. Among the items found on the beach near the estate were shoes.

10. The fact that Castellano led authorities to where more cocaine was hidden is not a confession, and thus does not implicate *Bruton.*

HOFFMAN, District Judge, concurring specially:

I readily join the majority opinion in affirming the convictions of Michael R. Bennett, William G. Bennett, and Eydler Castallano. My concern with respect to the cases against Cervantes and Feijo-Garcia is because of the flagrant disregard of the *Bruton* rule by the prosecutor and, to a limited extent, by the district judge. Nevertheless, as I analyze the confession of Castallano, it apparently meets the test of harmless error beyond a reasonable doubt, *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), even though the trial court failed to give any curative instruction as to the effect of the confession by Castallano until the final charge to the jury, although requested to so advise the jury on practically every occasion the confession was mentioned by the prosecutor, and even though the prosecutor rather obviously emphasized the Castallano confession on at least eight separate occasions, including at least twice in final argument.

Stripped of the Castallano confession, we have evidence which is clearly admissible against all parties. The testimony of the caretaker of the Palm Beach estate, Tom Basil, is without contradiction. On October 30, 1985, at approximately 6:30 a.m., Basil observed three Latin males approaching the estate from the beach. Each was dripping wet and full of sand. In response to a call from Basil, Officers Pradines and Muniz of the Palm Beach Police Department came to the scene and, en route, Officer Pradines saw the three Latin males "jogging."[11] Officer Pradines detained the three men awaiting backup units. Officer Muniz, speaking in Spanish, advised them of their rights and inquired as to their presence at that hour of the morning. Cervantes and Feijo-Garcia denied any knowledge of the blue boat located within 30 to

11. The three men could possibly qualify as "joggers" since they were dressed in shorts. However, Cervantes was "jogging" in his bare feet; Feijo-Garcia was wearing ankle-high tennis shoes; and Castallano had no shoes, but was running in socks only half on his feet.

50 yards of the beach behind the estate. Basil came to the scene and identified the three men as being the same three confronted on the property of the estate. When taken to headquarters, Cervantes and Feijo-Garcia declined to say anything, but Castallano gave a detailed statement as to how and where the three men had procured the cocaine which, in the interim had been located on the blue boat anchored in the surf, and was estimated to have contained 2,300 pounds, or approximately 750 kilograms, with a wholesale value of $21 million.[12]

After his arrest, the driver's license of Feijo-Garcia was taken and the address on the license matched the address of one Avelino Suengas, the registered owner of the blue boat on which the cocaine was located.

The government contends that the court, on two occasions, gave a cautionary instruction as to the treatment of the Castallano confession. It was admittedly given in the final charge following the argument of counsel. On the other occasion, following the prosecutor's opening statement, where the prosecutor used the word "they" in referring to the substance of the confession, the judge merely told the jury that "what the lawyers say in opening statement is not evidence."

The government concedes that there were two instances in the prosecutor's closing argument which "we [the government] acknowledge appears to improperly rely on Castallano's statement as inculpating Feijo and Cervantes." The government insists, however, that the errors cannot fairly be said to be "so pronounced and persistent that it permeated the entire atmosphere of the trial." The difficulty with this contention is that the court compounded the error by overruling the timely objection interposed by defense counsel and, immediately thereafter, the prosecutor continued the use of the word "they" in referring to what Castallano said. If prosecutors and courts pay so little attention to the *Bruton* rule as evidenced in this case, it is not unlikely that the day will arrive where an exception is engrafted on the harmless error rule in considering *Bruton* violations.

The majority correctly suggests that the *Bruton* rules is not applicable to the discovery of the 29 kilograms of cocaine which were thrown in the bushes on the property of the estate. While this was a part of Castallano's confession which led the authorities to the property where it was found, there was no suggestion by Castallano that Feijo-Garcia or Cervantes were involved. Where a codefendant's extrajudicial statement does not directly implicate the defendant, the *Bruton* rule does not come into play. *United States v. Belle*, 593 F.2d 487 (3rd Cir.1979) (en banc). The statement by the confessing defendant must also be vitally important to the government's case in order for its introduction to create a constitutional violation. *United States v. Key*, 725 F.2d 1123, 1126 (7th Cir.1984); *English v. United States*, 620 F.2d 150, 152 (7th Cir.1980) (where the confessing defendant related that three men had stopped at the Holiday Inn and "one of them registered there," and at trial the Holiday Inn reservation card bearing the name Alex English was admitted as evidence against English).

These defendants were charged with possession with intent to distribute cocaine, and a conspiracy to commit that same offense. It was not necessary to prove that Feijo-Garcia or Cervantes had any connection with Michael or William Bennett, for conspirators need not know all the members of the conspiracy. Any conspiracy, insofar as Feijo-Garcia and Cervantes are concerned, could be limited to the three who abandoned the blue boat loaded with cocaine. The essentials of the two crimes charged in the indictment are so relatively simple that Castallano's detailed confession was unnecessary as to all three of the males who initially attributed their activities to jogging. An examination of the Eleventh Circuit cases leads to the inevitable conclusion that, irrespective of whatever Castallano said, the proof of guilt was beyond a reasonable doubt. I therefore

---

**12.** The government's brief reduces the quantity of cocaine to "over 1,650 pounds of cocaine."

conclude that the jury hearing the confession of Castallano was harmless error.

Most of these detailed confessions given by non-testifying codefendant's are nothing more than corroboration for whatever the prosecution already knows. My concern is for the increased action on the part of prosecutors and judges to disregard the *Bruton* rule, but I do not feel comfortable in exercising any supervisory powers over such actions and, therefore, concur.