(No. 80242.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. REMON CASA WILLIAMS, Appellant.

*Opinion filed March 19, 1998.—Rehearing denied June 1, 1998.*

Daniel D. Yuhas, Deputy Defender, and Martin J. Ryan, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Steven R. Splitt, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Defendants Remon Williams, Michael Coleman, and Sherrell Towns were all indicted in the circuit court of Madison County on five counts of first degree murder (720 ILCS 5/9—1(a) (West 1994)), arising from the November 17, 1993, shooting deaths of five individuals. Williams and Coleman were tried jointly and a jury found both guilty on all counts. Williams waived his right to be sentenced by the jury and the trial judge determined he was eligible for the death penalty based on the aggravating factor that he was convicted of murdering two or more individuals. See 720 ILCS 5/9—1(b)(3) (West 1994). After considering factors in aggravation and mitigation, the trial judge determined that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, Williams was sentenced to death. See 720 ILCS 5/9—1(h) (West 1994).

Codefendant Coleman was sentenced to natural life imprisonment. See 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1994). Codefendant Towns was tried separately and was found guilty on five counts of first degree murder (720 ILCS 5/9—1(a) (West 1994)). Towns was sentenced to death, and his convictions and sentence were affirmed on direct appeal by this court in *People v. Towns*, 174 Ill. 2d 453 (1996). The instant appeal involves only Remon Williams' convictions and sentence. Williams'

sentence has been stayed pending this appeal. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

## BACKGROUND

Evidence presented at trial revealed the following. On November 17, 1993, Kim Fulton and her three children lived with Jeff Mosby in a trailer located at 204 Hare Street in Eagle Park. Kim left home that night about 8:30 p.m. to run some errands. At that time, Mosby was at home barbecuing and watching the three children. Sometime later in the evening, Mosby and the children were watching television when three men entered the trailer. Christopher Fulton, Kim's eight-year-old son, identified one of the men as "Little Mike," whom Christopher knew previously from the neighborhood and whom Christopher believed lived in the trailer next door. The men made Christopher lie on the floor with his face down. Little Mike and one of the other men then went into the back room of the trailer and Christopher heard Little Mike ask Mosby where their mail was. The men returned to the front room of the trailer and Little Mike yelled at Mosby and then shot him in the chest.

Kim returned home at about 10:30 p.m. with a friend, Demetria McIntire. Upon arriving at her trailer, Kim noticed a green minivan parked in the driveway of the neighboring trailer. Kim then saw three persons jump into the green minivan, and it pulled away in a hurry. When Kim and McIntire entered the trailer, they saw Mosby lying on the floor. Kim's children said "they killed Jeff." Kim asked Christopher what happened and in response Christopher kept repeating "the boy next door." McIntire called 911 and Kim went outside and yelled for David Thompson who was next door. The door to Thompson's trailer was cracked open but no one responded to Kim's calls.

At trial, Christopher identified Coleman as being

"Little Mike," the man who shot Mosby. On cross-examination, defense counsel elicited that during the police investigation into the murders Christopher was shown a photographic array of five men, which included Williams' picture. Christopher selected three men out of the array who he believed resembled the three men who entered his trailer that night. However, Christopher did not identify Williams as one of the intruders. Kim was unable to identify any of the three persons she saw get into the green minivan. McIntire did not see either the people or a minivan outside the neighbor's trailer; however, she was not wearing her glasses at the time and she does not see well at night without them.

State Police Officer Michael Terrell received a call at 10:28 p.m. the night of the murders. He responded to 204 Hare Street in Eagle Park. Terrell arrived at the same time as an ambulance, and the ambulance personnel attempted to resuscitate Mosby. After speaking with Kim regarding what had occurred, Terrell went next door to 206 Hare Street. Terrell found the front door of the trailer partially open. Terrell entered the trailer and immediately saw three men lying on the floor. The men had their hands bound with duct tape and tape had also been placed over their mouths. Terrell observed that all three men had massive head wounds and were lying in pools of blood. When Terrell noticed one of the men move, he returned next door to bring paramedics to the scene. Terrell returned to the trailer with paramedics, who attempted to resuscitate the man without success. At that time, Terrell discovered the body of another man to the right of the door.

The four men discovered in the trailer at 206 Hare Street were Marion Jennings, Bedford Jennings, Cedric Gardner, and David Thompson. Bedford Jennings, Gardner, and Thompson all had their hands and ankles bound with duct tape. It was stipulated at trial that all

four men had died of gunshot wounds. Gardner, Thompson, and Bedford Jennings all died of a single gunshot would to the head. Marion Jennings suffered separate gunshot wounds to the chest and head, with the head wound being the fatal wound. In addition, it was stipulated that Mosby died of a single gunshot to the forearm which passed into his chest causing the fatal wound.

There were no other witnesses to any of the shootings, but several prosecution witnesses gave testimony regarding events they observed on November 17 which may have been connected to the crimes. At about 9:45 p.m., Yuenna Sander was speaking with her brother, Bedford Jennings, on the telephone when she heard a gunshot. Bedford's phone was then hung up. Sander immediately called Bedford back but his answering machine answered the call. Sander did nothing more that night because she believed that Bedford and his roommates were just playing with guns, as they often did. Sander also testified that she had been present at the trailer at 206 Hare Street several times and was aware that drugs were being sold at the residence.

Candice Branch, a sixth-grade student who lived on Hare Street, was returning home from a school program some time between 9:30 p.m. and 10:00 p.m. While walking past Thompson's trailer, Branch saw three boys outside in the yard. A van was also parked outside the trailer. Branch heard one of the three boys say "let's go do this" or "let's smoke them." Branch ran home after hearing this. Although Branch could not identify anyone in the courtroom, she did pick Towns from a photo array as resembling one of the boys she saw that night.

Darren Wise, an Eagle Park resident, was walking to a tavern sometime between 9 and 10 p.m. As he was walking, a turquoise-green Chrysler van traveled past him in the direction of Hare Street. Wise was unable to see anyone inside the van. Wise returned home briefly

to retrieve something he had forgotten. After leaving his home again, Wise heard a gunshot, but he continued on to the tavern. Approximately 15 minutes later, Wise saw several ambulances drive by the tavern. On cross-examination by defense counsel, Wise admitted that at the time of the murders he was addicted to crack cocaine and had used drugs the day he saw the van.

Johnnie Mosley, codefendant Towns' cousin, testified that Towns and Williams visited him some time in the evening on November 17 in a minivan. During a conversation between the three men, Towns asked Mosley if he wanted to go with him to "take care of some business." Mosley testified that he declined Towns' invitation because he was on parole and did not "want to get involved in that anymore." On cross-examination, Mosley admitted that he was not sure what time or even what day it was that Towns and Williams visited him and that he was probably "high" at the time.

Chontelle Clark testified that she was driving around between 9 and 10 p.m. when she saw Williams, Towns, Coleman, and another boy in a dark-colored car at a stop light. Clark testified that she did not recognize the fourth person in the car. On cross-examination, Clark denied ever dating Towns. Also, defense counsel impeached Clark with the contents of a police report which stated that Clark had told police that Towns, Michael Coleman, and Eric Coleman were the only occupants of the car that evening.

Defendant Williams also offered the testimony of Theodore Beatty, a sheriff's deputy who interviewed Clark shortly after the murders. Beatty testified that Clark had stated to him that she was Towns' girlfriend. Clark had also stated that it was between 11 p.m. and 12 a.m. that she saw Towns, Michael Coleman, and Eric Coleman in a dark-colored car. Clark never mentioned seeing Williams with the others in the car that night.

Yulanda Allen testified that she was Towns' girlfriend. Between 10 and 10:30 p.m. Allen stopped by Towns' home. Allen noticed that both Towns' green minivan and grey Grand Am were parked outside. Allen entered the house and found Williams, Coleman, and Towns inside. Allen made plans to meet Towns later that evening and then she departed. Later, as Allen was dropping a friend off at home, Towns pulled up alone in a dark-colored automobile which was a Cadillac or a Park Avenue.

Several witnesses testified regarding the physical evidence found at the scene. At Thompson's trailer at 206 Hare Street, crime scene technicians found four spent shell casings stamped "Winchester nine millimeter." Two spent projectiles were discovered in the trailer and two spent projectiles were recovered underneath the trailer. In addition, a projectile fragment was recovered from Gardner's body. A bullet hole was also discovered in the door of the trailer, but the projectile which caused the hole was never recovered. At Mosby's trailer at 204 Hare Street, one spent 9-millimeter shell casing was discovered lying on the floor. A forensic scientist tested the projectiles and the shell casings and determined that all the shots were fired from the same gun, most likely a 9-millimeter handgun manufactured by Glock.

More than 100 fingerprints suitable for comparison were recovered from the crime scene. Of these, fingerprints matching Towns' fingerprints were discovered on the duct tape used to bind some of the victims. In addition, Towns' fingerprints were found on some papers in Mosby's trailer. Neither Williams' nor Coleman's fingerprints matched any fingerprints left at the scene. Although shoeprints were recovered at the scene, none of the prints matched the shoes that were seized from Williams.

An employee of Croft Motors testified that his company rented a green minivan to Elmer Jennings on November 6, 1993. Elmer Jennings testified that he rented a green minivan from Croft Motors for Roosevelt Towns, Sherrell Towns' uncle. Elmer saw Sherrell driving the minivan on one occasion. In addition, he saw Sherrell washing the minivan one or two days after the murders.

Tony Whitehead testified twice for the prosecution. The first time he testified, Whitehead was asked about a statement he had heard Williams make during a birthday party in a St. Louis hotel. Whitehead was unresponsive and stated that he needed "some air or something." After an examination outside the presence of the jury, the court declared Whitehead a hostile witness. The State then impeached Whitehead with a prior statement he had made to police in which he indicated he had heard Williams admit taking part in the murders.

On cross-examination, Whitehead admitted that at the time he made the statement he was in jail for violating probation. The day after giving the statement to police, Whitehead was released from jail. Whitehead stated that his statement consisted of things he heard about the crime on the street, not from anything he had heard Williams say. Whitehead admitted that at the birthday party he was drunk and everyone eventually got thrown out of the hotel because the party got too loud.

The next day of trial, Whitehead testified again. Whitehead stated that he contacted the prosecutor the previous night and informed him that he had not testified truthfully the first day because there were a couple of Gangster Disciples in the court room. Whitehead testified that he, Williams, and Coleman all belonged to the Gangster Disciples. Whitehead testified that he did overhear Williams talking at the birthday party. Whitehead heard Williams say that "he didn't know that Sher-

rell [Towns] didn't know how to do a murder." In addition, Williams stated that after Towns shot "those people," Williams picked up a shell casing. Whitehead also heard Williams claim to shoot three people.

Defendant Williams offered the testimony of Larry Delk. Delk testified that he attended the birthday party with Williams. The room where the birthday party was held was very crowded and noisy and a person had to shout in order to talk to someone. Delk did not recall seeing Whitehead at the party, and if he was there, Delk knew that Williams did not speak with Whitehead. Delk did not hear Williams ever talk about the murders. Delk also testified that the day of the murders he was with Williams riding around in Towns' Grand Am getting drunk and high. Williams dropped Delk off at home around dark.

Neither Williams nor Coleman testified. Williams presented evidence of an alibi. Williams' girlfriend and her family members testified that Williams came to their house between 4 and 6 p.m. the day of the murders. Williams was high and drunk and went into a bedroom and slept. At some point in the evening, Towns showed up at their house and exchanged his green minivan for the Grand Am that Williams had been driving. Williams did not leave with Towns and Williams remained at their home all night.

## ISSUES

On appeal, Williams' principal contention of error arises from the circuit court's refusal to sever his trial from that of codefendant Coleman. Prior to trial, the circuit court granted the State's motion to consolidate Williams' case with Coleman's case. See 725 ILCS 5/114—7 (West 1994). Thereafter, Williams filed a written motion to be tried separately from Coleman. See 725 ILCS 5/114—8 (West 1994). Defense counsel argued, *inter alia*, that Williams would be prejudiced by the

introduction of admissions by a nontestifying codefendant which implicated Williams. The circuit court denied the motion. Williams renewed his motion for severance several times prior to trial; however, the circuit court denied each request.

On the eve of trial, Williams waived his right to be sentenced by the jury and then made an oral motion for severance. Defense counsel argued that death-qualifying potential jurors for Coleman's sentencing would prejudice Williams. The court granted Williams' motion for severance. At that point, the State withdrew its request for the death penalty for Coleman. The court then reversed its ruling on defendant's severance motion.

Defense counsel also filed a motion *in limine* seeking to bar, *inter alia*, the introduction of out-of-court statements by any codefendant which "refers to or gives rise to any inference that inculpates [Williams] as such would violate the *Bruton* rule." Williams' counsel cited specific examples of statements made by codefendant Coleman that would imply the complicity of Williams and argued that use of such statements would violate Williams' right to confront witnesses. The circuit court denied Williams' motion. Immediately before trial began, the circuit court clarified its ruling on the motion *in limine*. The court stated that it would allow the introduction of Coleman's out-of-court statements, but admonished the State that the "statements [were] to be cleansed of all references to the non-declaring defendant."

Williams argues that the trial court erred in denying these motions and, therefore, he was denied a fair trial because the testimony of several witnesses improperly connected him to Coleman's admissions. See *People v. Duncan*, 124 Ill. 2d 400 (1988). Williams further contends that the admission of Coleman's statements at the joint trial with Williams violated his constitutional

right to confront and cross-examine witnesses against him. See U.S. Const., amends. VI, XIV; *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968).

Williams first protests the testimony of Alfred Lumpkins regarding a conversation Lumpkins had with Coleman in January 1994 while both men were incarcerated at the Madison County jail. During examination of Lumpkins by the State, there was the following colloquy:

"Q. Would you tell us what [Coleman] said regarding his charge?

A. That him and two other guys was—went to a trailer in Eagle Park and in a green mini-van to buy drugs and once they got inside [Coleman] went inside to set up a deal on a drug deal. Once he got inside he took Cecil Gardner—control of Cecil Gardner and waved the other guys to come on in and ordered the other guys to search the trailers and tie these guys up so they could search the trailer and at that time he got them all tied up.

Q. Did he say what they used to tie the people up?

A. Duct tape.

\* \* \*

Q. And what happened next?

A. They searched the trailer and then he ordered them to shoot them.

\* \* \*

Q. Did he tell you whether there would be any fingerprints or not?

A. Yes, he told me Towns left a fingerprint behind. That's because they had on gloves and Towns didn't. That's how—

MR. HILDEBRAND [Coleman's counsel]: I am going to object to the narrative, your Honor, move to strike.

MS. ROBBINS [Williams' counsel]: I am going to object to the references, your Honor, which we previously discussed in various Motions in Limine.

THE COURT: Thank you, ma'am. Overruled.

Q. Did Mr. Coleman tell you that he had worn gloves?

A. Yes, sir.

Q. Did he tell you anything about his clothing?

A. Yes, sir. He said he got rid of the clothing because they had blood and could have been identified through their clothing.

Q. Did he say how he got rid of the clothing?

A. They burned them.

Q. Did he say when they got rid of the clothing?

A. Right after they left Eagle Park and went to East St. Louis.

Q. Did he tell you anything about the trailer next door?

A. Yes. The reason he was—shot the guy outside because he could identify Coleman for coming out and the guy that was with him."

Williams also disputes the admission at his joint trial of the testimony of Robert Lockett. During direct examination, Robert testified that he and his brother, Michael, were with Coleman one day in June 1993. The three men were sitting in Coleman's car outside a liquor store planning a home invasion. Bedford "Sonny" Jennings and David Thompson, two of the murder victims, pulled up beside Coleman's car and Coleman stated that they could rob Thompson. Coleman then exited the vehicle and spoke with Thompson. Coleman quickly returned and informed the Locketts that the robbery would have to wait because Thompson did not have any dope at the time. Robert testified that he and his brother never participated in any robbery of Thompson because Michael was arrested and incarcerated soon thereafter.

Robert further testified that he, his brother Michael, and Coleman were all incarcerated in the Madison County jail at a later time. One day in December 1993 or January 1994, while all three men were waiting in a lounge to see their attorney, Robert entered into a conversation with Coleman about the murders. Robert testified:

"A. I asked him, why did they kill them. And he stated to me that one of the individuals jumped up and got shot in the chest so therefore they knew they were going to

have to do them all. And by that time, by him not being able to wear a mask because he had to get the door open he had to take care of the clucker in which I mention which is Jeff Mosby and at that time I asked him so I referred to—said so if you seen me with some money—

\* \* \*

Q. Did you convey that information to anyone?

A. You mean—

Q. Did you talk to anyone and tell them that you had been told about the murder?

A. I spoke with Sherrell but—

Q. Any law enforcement?

A. Yes, I contacted your office."

On cross-examination by Coleman's counsel, the following colloquy occurred:

"Q. You are telling this court that Mike Coleman sat down with you and told you all about this case here?

A. I am telling you and the Court that Mr. Coleman discussed this case with me due to the fact that we know circumstances and individuals and—

Q. You know what?

A. We know individuals such as Mr. Towns. As I said before I was in the same cell block and the initial conversation started."

Finally, Williams complains of the testimony of Michael Lockett. During examination by the State, Michael testified consistently with the testimony of his brother about the June 1993 meeting in Coleman's car, when Coleman identified David Thompson as a possible target for a robbery. Then, regarding the conversation between the three men in the Madison County jail, this dialogue followed:

"Q. And what was said at that time by Mr. Coleman?

A. Little Mike just said that—he said that he went—that he went into the trailer and that the gun actually [sic] went off or whatever. It was an accident and they knew they had to kill the rest.

Q. When he said it was an accident what did he say about that?

A. He said the gun—he heard the gun go pop, gun went off.

Q. Then he said they had to kill the rest?

A. Because they knew the boy was going to die."

Subsequently, during redirect examination by the State, the following colloquy occurred:

"Q. Did [defense counsel] ask you about any other acquaintances that you had or did she just ask you if you were going to testify about the police report?

A. What did she ask me, she asked me if I knew him. I don't know, I suppose that's Remon."

The court sustained defense counsel's immediate objection and instructed the jury to disregard Michael's reference to Williams.

During Robert Lockett's testimony, a sidebar conference was held at which defense counsel objected that Lumpkins' testimony regarding Coleman's admissions had not been cleansed of all references to Williams. The court overruled the objection. Counsel for both defendants then objected to the failure of the court to instruct the jury that the testimony of Lumpkins and Lockett was to be considered only against codefendant Coleman. The court agreed to so instruct the jury regarding Lumpkins' testimony when the sidebar ended. In addition, the court stated that it would instruct the jury regarding the testimony of the Lockett brothers after each witness testified. When the proceedings resumed, the prosecutor asked the judge if he had any instructions for the jury. In response, the court stated that it was going to wait until the witness was finished testifying. However, the court did not provide the jury with the appropriate limiting instructions regarding any of the three witnesses' testimony until the next day of the trial.

## DISCUSSION

In *Bruton*, the Supreme Court ruled that the admission at joint trial of a statement by a nontestifying codefendant which expressly implicates defendant in the

crime violates the defendant's constitutional right to confront witnesses against him. *Bruton*, 391 U.S. at 137, 20 L. Ed. 2d at 485-86, 88 S. Ct. at 1628. The *Bruton* Court reasoned that instructing the jury to disregard the statement in determining defendant's guilt or innocence was an inadequate substitution for the defendant's right to cross-examine the codefendant regarding the powerfully incriminating yet doubtfully credible extrajudicial statement. *Bruton*, 391 U.S. at 132-37, 20 L. Ed. 2d at 483-86, 88 S. Ct. at 1626-28.

This court subsequently addressed a similar issue in *People v. Duncan*, 124 Ill. 2d 400 (1988). In *Duncan*, the trial court admitted testimony at joint trial of an extrajudicial statement made by the nontestifying codefendant which named one of the victims and "Bill" as two of the people who stood in the way of the codefendant's control of the local drug trade. The trial court admitted a second statement which acknowledged the existence of a drug courier from Kansas City. Other testimony revealed that the defendant, William Duncan, had participated in delivering drugs from Kansas City. *Duncan*, 124 Ill. 2d at 408.

On appeal, this court granted Duncan a new trial, determining that the trial court erred in failing to sever Duncan's trial from that of the codefendant. This court stated that "we have allowed admission of such statements at joint trials only reluctantly, only with proper limiting instructions, and only if the statements are cleansed of *all references* to a nondeclaring defendant." (Emphasis in original.) *Duncan*, 124 Ill. 2d at 414. This court observed that the proper cleansing was not performed when the jury heard, among other things, a reference to a Kansas City drug courier "that in light of other testimony it might reasonably construe to mean defendant." *Duncan*, 124 Ill. 2d at 414.

In the instant case, Alfred Lumpkins testified that

Coleman said he and "two other guys" traveled to a trailer in Eagle Park in a green minivan. Once Coleman was inside the trailer, he ordered the other guys to restrain the occupants with duct tape. After searching the trailer, Coleman ordered "them" to shoot the victims. Coleman also said that Towns left fingerprints at the scene because, unlike Coleman and the remaining guy, Towns had not worn gloves. Coleman said that, because of the blood, "they" burned their clothing right after returning to East St. Louis. Both of the Lockett brothers testified that Coleman said that "they" believed that, after the first victim was shot, they needed to kill all the victims.

Other testimony offered against Williams showed that he was with Towns the evening of the murders in a green minivan while Towns solicited Johnnie Mosley to help "take care of some business." Another witness saw three men, one of whom looked like Towns, standing by a van outside David Thompson's trailer between 9:30 and 10 p.m. that same evening. One of the men said something like "let's go do this," or "let's smoke them." Christopher Fulton stated that Coleman and two other black men entered his trailer that evening and Coleman shot Mosby. Towns' fingerprints were discovered on papers inside Mosby's trailer. Kim Fulton returned home shortly after 10 p.m. that evening. Before entering her trailer to discover Mosby's body, Fulton saw three black men jump into a green minivan parked next door at Thompson's trailer and leave in a hurry. Williams was seen at Towns' home, along with Towns and Coleman, between 10 and 10:30 p.m. the night of the murders. Towns' green minivan was parked outside. At the crime scene, evidence technicians found Towns' fingerprints on the duct tape used to bind the victims. However, neither Williams' nor Coleman's fingerprints were found at the scene.

We disagree with the State's assertion that Coleman's statements did not prejudice Williams merely because there was no direct reference to him by either his name or nickname. As this court observed in *Duncan*:

> "[F]or its use at a joint trial to be weighed against a defendant's right to confrontation, a codefendant's 'confession or admission' need not expressly state that a defendant was involved in an offense; it is sufficient that it clearly imply the defendant's guilt when considered in light of other evidence against the defendant." *Duncan*, 124 Ill. 2d at 410.

This court has repeatedly rejected the contention that substitution of another word for the defendant's name cures the *Bruton* error when the substituted term still plainly identifies defendant. See *People v. Hernandez*, 121 Ill. 2d 293, 313-18 (1988) (improper under *Bruton* to revise codefendant's statements to say that "friends" or "two other named individuals" were involved in the crime); *People v. Cruz*, 121 Ill. 2d 321, 331-35 (1988) (same); *People v. Johnson*, 13 Ill. 2d 619, 623-25 (1958) (error to substitute defendant's name with "Blank"); *People v. Hodson*, 406 Ill. 328, 333-35 (1950) (error to substitute defendant's name with a letter); see also *United States v. Bennett*, 848 F.2d 1134, 1142 n.8 (11th Cir. 1988) (revising codefendant's admission to state "they" were involved still clearly referred to defendants).

When considering Coleman's statements in light of the other evidence offered against Williams, it is clear that they implied Williams' guilt. Although Coleman's admissions are not directly inculpatory of Williams in that they did not explicitly name Remon Williams as his accomplice, the nature of these statements in the context of the joint trial and the testimony linking Williams with Coleman and Towns rendered it impossible for the jury to conclude that the other person to whom Coleman referred was anyone other than the man seated next to him in the courtroom.

The State nevertheless urges this court to follow the holding of *Richardson v. Marsh*, 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987), and find that the limiting instruction provided to the jury was an adequate protection of Williams' rights. The State supports its contention by arguing that, unlike *Duncan*, the prosecutor did not encourage the jury to use Coleman's admissions against Williams. Under these circumstances, the State contends that the limiting instructions given to the jury were adequate to protect Williams' rights.

We first observe that this case does not fall under the purview of the *Richardson* holding. In *Richardson*, the Supreme Court addressed a scenario where the nontestifying codefendant's written confession was redacted to eliminate all references to defendant's existence. The codefendant's confession did not become incriminating of defendant until defendant's own testimony placed herself in the codefendant's company during the crime. Under these circumstances, the Court declined to extend the *Bruton* reasoning, holding that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when *** the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211, 95 L. Ed. 2d at 188, 107 S. Ct. at 1709. The *Richardson* Court expressly refused to consider the admissibility of a nontestifying codefendant's statement in which, as here, the defendant's name has been replaced with a neutral pronoun. *Richardson*, 481 U.S. at 211 n.5, 95 L. Ed. 2d at 188 n.5, 107 S. Ct. at 1709 n.5.

Unlike *Richardson*, which dealt with a written confession carefully redacted to eliminate even an anonymous reference to the defendant, the instant case involves the oral testimony of third parties regarding a codefendant's out-of-court admissions which inculpated

two other defendants. This court has criticized attempts to cleanse such oral testimony to procure admissibility at a joint trial (see, *e.g.*, *Duncan*, 124 Ill. 2d at 408; *Cruz*, 121 Ill. 2d at 330), and the Supreme Court has recognized the dangers that can occur when such a witness mistakenly or intentionally refers to the defendant while testifying, as Michael Lockett did in this case (see *Bruton*, 391 U.S. at 134 n.10, 20 L. Ed. 2d at 484 n.10, 88 S. Ct. at 1626 n.10).

For Coleman's statements to be otherwise admissible under *Richardson*, a proper limiting instruction would still be required. See *Richardson v. March*, 481 U.S. 200, 211, 95 L. Ed. 2d 176, 188, 107 S. Ct. 1702, 1709 (1987); *Duncan*, 124 Ill. 2d at 411. Here, the limiting instructions were not proper. Despite a timely request, the limiting instructions were not given contemporaneously with any of the disputed witnesses' testimony; the jury was not instructed regarding the disputed witnesses until the day after they all finished testifying. See *Duncan*, 124 Ill. 2d at 411; see also *Bennett*, 848 F.2d at 1142 n.8 (jury should be instructed at time the confession is admitted to consider it only against declaring defendant).

Furthermore, and contrary to the State's assertion, the prosecution did encourage the jurors to consider Coleman's admissions against Williams. Such actions erased any possibility that the jury would be able to follow the mandate of the limiting instructions. See *Duncan*, 124 Ill. 2d at 411; *Hernandez*, 121 Ill. 2d at 313-14; *Cruz*, 121 Ill. 2d at 332-33. During closing arguments to the jury, the prosecutor specifically addressed the connections between Williams' and Coleman's statements:

> "Now we're talking about how much time would it take to bind the people up. I don't know. I don't know how fast you act in a crime like this. But if there are two people doing it, it goes faster. Are there two people? Look at the evidence. On two of the victims Sherrell Towns' fingerprints

appear on the tape, not the third. *Was Alfred Lumpkins right? Was somebody wearing gloves that was helping?* I don't know. That's for you to decide." (Emphasis added.)

Lumpkins testified that Coleman stated that he and one of the perpetrators wore gloves. Moreover, Lumpkins testified that Coleman ordered the "other guys" to bind the victims with the duct tape. Therefore, the prosecutor's statement was intended to refer directly to Williams.

In another instance, the prosecutor commented on Coleman's attempts to recruit accomplices to rob these specific victims:

"Travon Watt was on the street in November. He testified that he sees Michael Coleman, Ramone [*sic*] Williams and Sherrell Towns together. What's the significance of that? The significance of that is that we have Michael Coleman who has looked for someone to commit the crime with him. He's been unsuccessful because the victims didn't have the money at that time and didn't have the right things, so he's still looking.

At that time he finds someone to commit the crime. He finds two more. He finds Ramone [*sic*] Williams and Sherrell Towns. Now, they aren't committing it then, but they're out. They're associating."

The only testimony regarding Coleman's predisposed intent to rob the specific victims came from the Lockett brothers, which was admissible only against Coleman. However, the prosecution utilized that testimony here to transfer that intent to Williams.

Finally, commenting on the deals offered by the State in exchange for the testimony of the Lockett brothers, the prosecutor stated:

"You've heard from the Lockett's, [*sic*] and I've talked with you about them. It's not easy to offer something to someone to come in to testify. As a prosecutor, we sit in a tough chair. You've got to be fair. You've got to make decisions that affect people's lives. And you have to make a call once in a while. If the call is letting *two people* go for five murders or taking someone who's been in trouble

before that has no convictions and is a first offense and pleading for six years to the penitentiary, then that's the call we have to make." (Emphasis added.)

The prosecutor's comment implied to the jury that the Locketts had testified against both Coleman and Williams.

The Supreme Court has recognized that it is error for a prosecutor to attempt to negate the court's limiting instruction by encouraging the jury to use a codefendant's statements in evaluating a defendant's case. See *Richardson*, 481 U.S. at 211, 95 L. Ed. 2d at 188, 107 S. Ct. at 1709. The prosecution's attempts during closing arguments to connect Williams to Coleman's statements was a "constitutionally unacceptable attempt *** to circumvent the strictures of *Bruton* and the confrontation clause." *Cruz*, 121 Ill. 2d at 333. Moreover, the admission of Coleman's statements "at a joint trial, absent a total deletion of all references to defendant, violated established Illinois case law that is independent of *Bruton-Richardson* constitutional doctrine." *Duncan*, 124 Ill. 2d at 415.

We cannot agree with the State's assertion that the error of admitting Coleman's statements at Williams' joint trial was harmless. The evidence against Williams was not overwhelming. Towns was linked to the murders by direct physical evidence. Coleman was identified by the only eyewitness to any of the shootings and admitted his involvement in the murders on two separate occasions. However, the bulk of the evidence against Williams was circumstantial; Williams was linked to the crime by being seen in the company of Towns and Coleman at times surrounding the murders. The only direct evidence of Williams' involvement was an out-of-court statement testified to by Whitehead, a witness who changed his testimony on the stand. Therefore, determining the outcome of the trial in the absence of the improper testimony is impossible and reversal and

remand for a new trial is the necessary and proper remedy. See *Cruz*, 121 Ill. 2d at 335.

In order to address the issue of subjecting Williams to double jeopardy, we address Williams' contention that the evidence was insufficient to sustain his convictions. See *People v. Jones*, 175 Ill. 2d 126, 134 (1997); *People v. Taylor*, 76 Ill. 2d 289, 309 (1979). Williams argues that no physical evidence connected him to the murders, the sole eyewitness to any of the shootings failed to identify him, and the only direct evidence that he participated in the crimes was the highly questionable testimony of Tony Whitehead. Williams argues further that his alibi evidence and the testimony of his own witnesses greatly contradict the State's evidence.

We find that the competent evidence presented against Williams was such that the jury could have concluded that he was proved guilty beyond a reasonable doubt. Proof of physical evidence connecting a defendant to a crime has never been required to establish guilt. *Hernandez*, 121 Ill. 2d at 319. In addition, circumstantial evidence is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged. *People v. Digirolamo*, 179 Ill. 2d 24, 43 (1997). The determinations of the credibility of witnesses and the weight to be given to their testimony are responsibilities that must be left to the trier of fact. See *People v. Steidl*, 142 Ill. 2d 204, 226 (1991); *Cruz*, 121 Ill. 2d at 336. Finally, the jury was not obligated to accept alibi evidence given by Williams' girlfriend and her family over the State's evidence. See *People v. Jimerson*, 127 Ill. 2d 12, 46 (1989); *Hernandez*, 121 Ill. 2d at 320.

In conclusion, we observe that we are not making a finding as to Williams' guilt or innocence which would be binding on retrial, but rather, we consider the evidence in order to protect Williams' constitutional right

against double jeopardy. See *Taylor*, 76 Ill. 2d at 309-10. We find that under the evidence presented here, retrial of Williams would not constitute double jeopardy.

Because of our reversal of Williams' convictions on the *Bruton-Duncan* errors, we need not address the other issues raised in this appeal.

## CONCLUSION

For the reasons set forth herein, the defendant's convictions are reversed and his sentence vacated. This cause is remanded to the circuit court of Madison County for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*