2020 IL App (1st) 180737-U

No. 1-18-0737

Order filed November 5, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 3266 |
| | ) | |
| ANTONIO SCOTT, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for aggravated battery with a firearm affirmed where the victim's identification of defendant was credible and sufficient to prove defendant guilty beyond a reasonable doubt, and trial counsel did not render ineffective assistance.

¶ 2    Following a bench trial, defendant Antonio Scott was convicted of aggravated battery with

a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) and sentenced to 14 years' imprisonment. On

appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt

because the victim's identification of him was not credible where it was inconsistent with the victim's initial statements to police, and there was no physical evidence implicating defendant. Defendant also contends that trial counsel rendered ineffective assistance by opening the door to testimony that defendant was in prison for five or six years prior to the shooting, which answered the trial court's question about how a shooting in 2017 could be an act of retaliation for the 2009 fatal shooting of defendant's brother. We affirm.

¶ 3    Defendant was charged with four counts of attempted first degree murder and one count of aggravated battery with a firearm for shooting Walter Harris. At trial, Harris acknowledged that he had a 2010 conviction for aggravated driving under the influence (DUI) and served time in prison. Harris testified that about 3:30 p.m. on January 27, 2017, he arrived at a house in the 5900 block of South Carpenter Street to visit his friend Antonio Campbell. As Harris walked towards Campbell's house, a red Impala drove past him. Harris observed defendant slumped down in the passenger seat of the Impala, leaning back with his head tilted to the right. Defendant looked up at Harris, and Harris looked down at defendant. Harris knew who defendant was because defendant used to live across the street from Harris' grandmother. Harris had been friends with defendant's brother, Roderick, who was known as "Bow Wow." When Roderick was killed a few years earlier, Harris had laid on the ground with him until the ambulance arrived. Harris learned who defendant was after Roderick died. Harris identified defendant in court.

¶ 4    The Impala stopped a few houses away. There was no one else out on the street at the time. As Harris stood on Campbell's porch, defendant exited the Impala and ran towards Harris. Defendant began shooting at Harris from outside the front gate of Campbell's house. Harris was shot in his right hand between his thumb and forefinger. Harris tried to enter the door to Campbell's

house, but it was locked. Harris "hopped" over the porch bannister to the ground below. He fell, hit his head on the gas meter, and hit his head and back on the ground. Defendant continued shooting "steady" at Harris. Harris "scrambled" to get away, "crawling real fast" on his hands and knees. He heard gunshots hitting the house. Harris crawled into the gangway on the side of the house and was shot in his left heel. The gunshots then stopped. Harris heard a total of 15 to 16 gunshots. The only person Harris saw shooting was defendant.

¶ 5 Harris reached the alley behind Campbell's house and observed the Impala drive away. Harris hopped back through Campbell's yard to the gangway and yelled for Campbell to come outside and take him to the hospital. Campbell, Brandon,[1] and Frederick Fizer came outside and took Harris to St. Bernard Hospital. The bullet that entered Harris' foot cracked his heel and was surgically removed from under his knee.

¶ 6 At the time of the shooting, Harris was dating Shameka Peppers. On the way to the hospital, Harris called Peppers and told her he had been shot and to meet him at the hospital. The prosecutor asked Harris "[d]id you tell her who shot you?" Harris replied, "[y]eah. I told everybody who shot me." At the hospital, Harris initially spoke with some police officers. The officers spoke with Peppers first, then Harris. The officers told Harris that Campbell's house was on fire and questioned him about the fire. The house was not on fire while Harris was there. Harris did not identify defendant as the shooter to those officers because they did not ask him questions "like that," but instead, were focused on the fire. Harris was told that detectives would come to see him in a couple of days. Harris testified that he would rather talk to the detectives. Harris denied that

---

[1] Brandon's last name does not appear in the record.

he told anyone that "Christopher" shot him. On February 2, 2017, Harris viewed a photo array at the police station and identified defendant as the person who shot him.

¶ 7    On cross-examination, Harris confirmed that he knew who defendant was because Harris was raised on that block of Carpenter and defendant used to "hang" with "the guys" who lived across the street. Harris had previously seen defendant but never spoke with him. Harris spent a lot of time with defendant's brother Roderick ever since Roderick was young. He described Roderick as "a little kid I used to give dollars and stuff to." Harris never had a problem with defendant.

¶ 8    Harris observed two people inside the Impala. He knew defendant was the passenger because he looked defendant in the face. Harris denied telling any police officers or detectives that there were three unknown men inside the Impala. He reiterated that the initial officers at the hospital were focused on how the fire started and told Harris that a detective would come to speak with him. Harris acknowledged that the initial officers asked how he was shot, and he gave them the address. The officers stated that they previously raided that house and asked defendant about his involvement with the men there.

¶ 9    Harris testified that he told Detective Robert Kuchay who shot him when he met with Kuchay at the police station. Kuchay did not come to the hospital. Harris did not know anyone named "Christopher" and never told Kuchay that Christopher shot him. Harris could not recall what the shooter was wearing. Defendant began running and shooting immediately when he exited the Impala. He began firing the shots from 40 feet away and got as close as 8 feet from Harris. The shooter never said anything to Harris.

¶ 10 On redirect examination, Harris testified that he was receiving pain medication when he spoke with the officers at the hospital. He told those officers that he had been shot, where it occurred, and what happened. They told Harris that the detectives would come to see him.

¶ 11 Chicago detective Joseph Murtaugh testified that he showed a photo array to Harris on February 2 at the police station. Harris identified defendant as the man who shot him.

¶ 12 Chicago police evidence technician David Seiber testified that he processed the crime scene at 6:30 p.m. on the night of the shooting. Seiber photographed the scene and the house, which had sustained fire damage. Seiber identified photographs of 17 fired cartridge casings he recovered from the street, the parkway, and outside the fence in front of the subject house.

¶ 13 On cross-examination, Seiber testified that 16 of the recovered shell casings were .40-caliber, and one was .380-caliber. The .380-caliber casing was recovered from the parkway in front of the house next to the subject house.

¶ 14 Chicago police officer Michael Pfeiffer testified that about 3:40 p.m. on January 27, he and his partner, Officer Jack Miller, spoke with Harris at the hospital regarding the shooting. After speaking with Harris, Pfeiffer spoke with Peppers in the lobby. After his conversation with Peppers, Pfeiffer was given the name "Antonio Scott." Pfeiffer also met with Detective Kuchay at the hospital and gave him defendant's name.

¶ 15 On cross-examination, Pfeiffer testified that Harris described the vehicle and described the gunman as a black man in his 20s. Harris did not give Pfeiffer a specific name. Generally, Pfeiffer asks all victims if they know who shot them. On redirect examination, Pfeiffer testified that after he received defendant's name, Detective Kuchay spoke with Harris; Pfeiffer did not.

¶ 16    Detective Robert Kuchay testified that when he arrived at the hospital, Pfeiffer gave him information that he received from Peppers. Kuchay spoke with Peppers, who gave him a name. Kuchay then spoke with Harris, who gave him the name "Antonio." Harris did not know Antonio's last name. Kuchay used the name Antonio and the information from Peppers to compile a photo array that included defendant's photograph. Kuchay identified defendant in court. A few days later, Kuchay gave the photo array to Detective Murtaugh to show to Harris. After the photo array was shown to Harris, Kuchay issued an investigative alert for defendant.

¶ 17    On cross-examination, Kuchay denied that Harris gave him the name "Christopher." Kuchay acknowledged that his supplemental case report indicated that Harris told him that he was shot by Christopher.

¶ 18    On redirect examination, Kuchay recalled that Harris told him that he was unsure of the gunman's last name, but that he was Bow Wow's little brother. Harris also told Kuchay that Bow Wow's name was Roderick, that he was killed in 2009, and that Roderick was Christopher's older brother. This interview occurred at the hospital. Kuchay had a second conversation with Harris when he came to the police department to view the photo array. During the second interview, Harris did not use the name Christopher. Harris told Kuchay that when Roderick was shot and killed, "he" was on the scene holding Roderick in his arms, and that was how Harris remembered and recognized defendant.

¶ 19    Shameka Peppers, Harris' former girlfriend, testified that Harris called her shortly after 3:30 p.m. on January 27 while he was on his way to the hospital. Harris told her what happened and said "Antonio" was involved. Harris did not give her a last name. Peppers knew of defendant and knew his last name. At the hospital, Peppers gave the police defendant's full name.

¶ 20 On cross-examination, Peppers testified that when Harris told her "Antonio" shot him, she knew he meant defendant. Peppers knew defendant's brother and used to do defendant's mother's hair.

¶ 21 Pursuant to the court's questioning, Peppers explained that when Harris said "Antonio" shot him, she knew he was referring to defendant because she knew defendant did not like Harris since defendant's brother was killed in 2009. The court asked, "[p]eople are doing something about it in 2017?" Peppers explained that after his brother was killed, defendant was incarcerated. Defense counsel objected and asked that Peppers' response be stricken. The court struck the part about being incarcerated and stated, "I'm not going to consider that."

¶ 22 The prosecutor had no questions based on the court's questioning. Defense counsel asked Peppers if defendant's brother "was shot in 2009?" Peppers replied, "[y]es." Counsel asked, "[t]his happened in [*sic*] January 27, 2017, correct?" Peppers again replied, "[y]es." The prosecutor stated, "Judge, he opened the door now." The following colloquy then occurred:

"[THE PROSECUTOR:] Why do you think that in 2017, all of a sudden, Antonio Scott would be the one shooting Walter?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. The door is open. You may answer.

[PEPPERS]: Because Antonio, right after his brother got killed, he got in trouble with the jail. Do [*sic*] could nothing about it then. He in jail for five, six years or something."

On recross-examination, Peppers acknowledged that she knew defendant was released from prison in 2015. Counsel asked, "[s]o, two more years passed by?" Peppers replied, "[y]es."

¶ 23 The State presented a stipulation that forensic scientist Elizabeth Haley, an expert in firearms examination, analyzed the 17 fired cartridge casings recovered from the scene. Haley found that the 16 .40-caliber Smith and Wesson casings were all fired from the same firearm, and the single .380-caliber casing was suitable for further testing.

¶ 24 The defense called Chicago police officer Jack Miller who testified that he and his partner, Officer Pfeiffer, met with Harris at the hospital. Pfeiffer spoke with Harris while Miller took notes. Harris told Pfeiffer that a red Impala occupied by three unknown men pulled up in front of the house. An unknown man exited the vehicle and began walking toward Harris. The offender displayed a handgun and fired approximately 10 to 15 shots. Miller did not recall Harris identifying the name of the person who fired the weapon.

¶ 25 On cross-examination, Miller acknowledged that Harris was being treated for two gunshot wounds while he was being interviewed. Miller agreed that Harris never told the officers that he did not know who the shooter was, but rather, Harris did not give them a name.

¶ 26 On redirect examination, Miller confirmed that he wrote the general case report, and the name of the offender does not appear in that report. Nor does the report indicate that Harris was reluctant or hesitant to tell the officers who shot him.

¶ 27 The trial court found that it was "persuaded beyond any question" that Harris knew defendant. The court pointed out that Harris was close friends with defendant's brother, that he was with Roderick when he was shot and killed, and that he had known who defendant was for years. The court noted that Harris identified defendant to the police and in court, and stated that Harris persuaded the court that defendant was the person who shot him. The court stated that because Harris was shot in the hand and foot, it gave defendant the benefit of the doubt and

acquitted him of the attempted first degree murder charges. The court found defendant guilty of aggravated battery with a firearm.

¶ 28 In his motion for a new trial, defendant argued that Harris' testimony identifying him as the shooter was inconsistent where Harris did not provide defendant's name to the initial officers at the hospital but later identified defendant, a person whom Harris had known for many years. Defendant argued that Harris did not know who shot him. Defendant further argued that there was no evidence corroborating Harris' identification such as a gun, gunshot residue, DNA, or another witness that placed defendant at the scene. Defendant also argued that Harris was a convicted felon, which affected his credibility.

¶ 29 The trial court responded that identification was an important issue in this case and that defendant had made the same arguments at trial. The court stated that it listened carefully to Harris' testimony and the sequence of events. The court further stated:

"I find that he identified Mr. Scott, the person that he knows and I cannot emphasize enough that he knows him, he knows him, he was there when the brother got shot. He knows who this is. He talked to his girlfriend and told her about it right after he was hospitalized.

Police were concerned about an arson that had taken place also. They were investigating simultaneously. He was very adamant and consistent with his identification of Mr. Scott. I believed him beyond a reasonable doubt."

The trial court denied then defendant's posttrial motion and sentenced him to 14 years' imprisonment.

¶ 30    On appeal, defendant first contends that the State failed to prove him guilty beyond a reasonable doubt because Harris' testimony identifying him as the shooter was not credible where it was inconsistent with Harris' initial statements to police. Defendant asserts that Harris initially told police that he observed three unknown men inside a vehicle and one of those men exited the vehicle and began shooting at him. Defendant argues that Harris later told police that "Christopher" shot him. Defendant notes that Harris told Peppers he was shot by "Antonio," but argues that Harris did not tell police that he recognized defendant, nor did he give the initial officers defendant's name. Defendant claims that Harris' inconsistencies and his status as a convicted felon rendered his testimony not credible. He also asserts that there was no physical evidence linking him to the shooting.

¶ 31    The State responds that the evidence was sufficient to prove defendant guilty where Harris knew defendant, clearly observed defendant shooting at him, positively identified defendant to Peppers immediately after being shot, and positively identified defendant in a photo array and at trial. The State asserts that Harris' identification of defendant satisfied all the factors for reliability announced in *Neil v. Biggers*, 409 U.S. 188 (1972). The State further argues that Harris explained that he did not give the initial officers defendant's name because they were focused on the fire and told him a detective would investigate the shooting. The State also argues that Harris' prior conviction for aggravated DUI was not a crime of dishonesty and had no impact on his credibility.

¶ 32    In reply, defendant asserts that the issue is not whether the *Biggers* factors were satisfied, but instead, whether Harris was a sufficiently credible witness to sustain the conviction.

¶ 33    When a defendant claims that the evidence is insufficient to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State,

any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). This standard applies whether the evidence is direct or circumstantial, and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 34    In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences from therein. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We will not reverse a criminal conviction based upon insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable doubt as to defendant's guilt (*People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011)), nor simply because defendant claims that a witness was not credible or that the evidence was contradictory (*Siguenza-Brito*, 235 Ill. 2d at 228).

¶ 35    To prove defendant guilty of aggravated battery with a firearm as charged in this case, the State was required to show that, in committing a battery, he knowingly discharged a firearm, other than a machine gun or a firearm equipped with a silencer, and caused injury to another person, specifically, that he shot Harris about the body. 720 ILCS 5/12-3.05(e)(1) (West 2016).

¶ 36    "Proof of physical evidence connecting a defendant to a crime has never been required to establish guilt." *People v. Williams*, 182 Ill. 2d 171, 192 (1998). Identification of a defendant by a single witness is sufficient to sustain a conviction where the witness viewed defendant under circumstances that permitted a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

Such identification is sufficient even where defendant presents contradictory testimony, as long as the witness had an adequate opportunity to view the offender, and provided a positive and credible identification in court. *Id*.

¶ 37    In assessing identification testimony, the court considers: (1) the witness' opportunity to view the offender at the time of the offense; (2) his degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the witness' level of certainty at the identification confrontation; and (5) the length of time between the offense and the identification confrontation. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995) (enumerating the factors set forth in *Biggers*, 409 U.S. at 199-200).

¶ 38    Here, viewed in the light most favorable to the State, the record shows that all the factors weigh in support of the trial court's finding that Harris' identification of defendant as the shooter was reliable. Harris testified that as the Impala drove past him, he observed defendant slumped down in the passenger seat, leaning back with his head tilted to the right. Defendant looked up at Harris, and Harris looked down at defendant, looking him in the face. Harris testified that he knew who defendant was because defendant used to live across the street from Harris' grandmother, defendant used to hang out with guys who lived across the street from Harris, and Harris had been good friends with defendant's brother, Roderick. Harris further testified that he observed defendant exit the Impala, run towards him, and shoot at him. Defendant came as close as eight feet from Harris. Harris, Peppers and Kuchay all testified that shortly after the shooting, Harris named defendant as the man who shot him. Five days after the shooting, Harris identified defendant in a photo array. Harris also identified defendant in court.

¶ 39    The testimony thereby shows that Harris had more than an ample opportunity to view defendant at the time of the offense and his degree of attention was very high. Harris had known defendant for years and recognized him immediately, rendering his identification of defendant accurate and certain. Furthermore, Harris identified defendant by name to Peppers and Kuchay shortly after the shooting while being treated at the hospital. All the factors therefore support the court's finding that Harris' identification of defendant was reliable.

¶ 40    Defendant's argument that Harris' testimony identifying him as the shooter was inconsistent and not credible is unpersuasive. It was the trial court's responsibility to weigh all the evidence and determine whether it was sufficient to find that Harris positively identified defendant beyond a reasonable doubt. *Siguenza-Brito*, 235 Ill. 2d at 228. Here, Harris testified that he did not give defendant's name to the officers who initially spoke with him at the hospital, Pfeiffer and Miller, because they did not ask him questions "like that," but instead, asked him several questions about the house fire. The officers told Harris that detectives would come to see him. Harris testified that he would rather speak with the detectives, and in fact, identified defendant by name to Detective Kuchay a short time later. Harris denied telling police that there were three unknown men inside the Impala. Miller agreed that Harris never told the officers that he did not know who the shooter was, but rather, Harris did not give them a name. Harris also denied that he told anyone that "Christopher" shot him. Although the name "Christopher" appeared in Kuchay's supplemental case report, Kuchay denied that Harris gave him the name "Christopher" and testified that Harris told him "Antonio" shot him.

¶ 41    When finding defendant guilty, the trial court stated that it was "persuaded beyond any question" that Harris knew defendant and that defendant was the person who shot Harris. In

denying defendant's posttrial motion, the court considered and rejected the same arguments defendant raises here. The court stated that it could not "emphasize enough" that Harris knew defendant, that Harris was "very adamant and consistent with his identification" of defendant, and that the court believed Harris "beyond a reasonable doubt." Based on this record, we find no reason to disturb the trial court's determination.

¶ 42     Defendant next contends that his trial counsel rendered ineffective assistance by opening the door to Peppers' testimony that defendant was in prison for five or six years prior to the shooting, which explained how defendant's shooting of Harris in 2017 could have been in retaliation for the 2009 fatal shooting of defendant's brother. Defendant points out that counsel objected to Peppers' initial testimony that defendant was incarcerated after his brother was killed. He argues that the objection shows that counsel believed such testimony was prejudicial to defendant. Defendant argues that there was no reasonable justification for counsel to open the door and pursue his line of questioning with Peppers. Defendant claims he was prejudiced by counsel's action because it painted him as a convicted felon and buttressed the claim that he shot Harris in retaliation for his brother's shooting. Defendant asserts that the Peppers' testimony was "central to the ultimate issues" and bolstered a weak case against him where Harris' identification was not credible and there was no physical evidence linking defendant to the shooting.

¶ 43     The State responds that counsel was not ineffective because defendant was not prejudiced by Peppers' testimony. The State argues that the challenged testimony had no impact on the court's guilty finding where the court emphasized that Harris knew defendant and that Harris' identification of defendant as the person who shot him was credible. The State asserts that nothing in the record suggests that the testimony that defendant was incarcerated for an unknown offense

for an unknown length of time had any influence on the outcome. The State argues that counsel made a strategic choice to attempt to show the weakness of the retaliation motive suggested by Peppers, and counsel cannot be found ineffective by questioning his strategy in hindsight.

¶ 44    Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To support a claim of ineffective assistance of counsel, defendant must demonstrate that counsel's representation was deficient, and as a result, he suffered prejudice. *Strickland*, 466 U.S. at 687. Specifically, defendant must show that counsel's performance was objectively unreasonable, and that there is a reasonable probability that the outcome of the proceeding would have been different if not for counsel's error. *Veach*, 2017 IL 120649, ¶ 30. The manner in which counsel cross-examines a particular witness involves the exercise of professional judgment which is entitled to substantial deference on review. *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997). However, if defendant cannot prove that he suffered prejudice, this court need not determine whether counsel's performance was deficient. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). Moreover, *Strickland* requires defendant to demonstrate actual prejudice, and mere speculation as to prejudice is not sufficient. *People v. Bew*, 228 Ill. 2d 122, 135-36 (2008) (and cases cited therein).

¶ 45    Here, the record shows that defendant suffered no prejudice from Peppers' testimony that he had been incarcerated. As discussed above, the trial court found defendant guilty because it was "persuaded beyond any question" that Harris knew defendant and credibly identified defendant as the person who shot him. There is no indication in the record that the court gave any consideration to Peppers' testimony that defendant had been incarcerated, or to her speculation that defendant

shot Harris in retaliation for his brother's killing. The court made no mention of defendant's incarceration or the alleged retaliation motive. The court, in fact, gave defendant the benefit of the doubt and acquitted him of the attempted first degree murder charges. Based on this record, we cannot find a reasonable probability that the outcome of the trial would have been different if counsel had not opened the door to Peppers' testimony. *Veach*, 2017 IL 120649, ¶ 30. Because defendant suffered no prejudice, counsel's actions did not constitute ineffective assistance. *Givens*, 237 Ill. 2d at 331.

¶ 46    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 47    Affirmed.