2022 IL App (1st) 200745-U

No. 1-20-0745

Order filed April 8, 2022

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 22269 |
| | ) | |
| STANLEY YURGAITIS, | ) | Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The second-stage dismissal of defendant's postconviction petition is affirmed, where counsel on direct appeal did not provide ineffective assistance by failing to challenge the sufficiency of the evidence establishing defendant's guilt.

¶ 2     Defendant Stanley Yurgaitis appeals from the second-stage dismissal of his postconviction petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). On appeal, he alleges the circuit court improperly dismissed his petition where he

made a substantial showing that counsel on direct appeal provided ineffective assistance by failing to challenge the sufficiency of the evidence at trial. We affirm.

¶ 3    Following a 2007 jury trial, defendant was found guilty of one count each of predatory criminal sexual assault, criminal sexual assault, and aggravated criminal sexual abuse, premised on an incident in which he inserted his finger inside the minor victim R.F.'s vagina and touched her breast with his mouth. Defendant was sentenced to a term of natural life imprisonment for predatory criminal sexual assault and a concurrent seven years' imprisonment for aggravated criminal sexual abuse. We affirmed on direct appeal. *People v. Yurgaitis*, No. 1-07-1253 (2009) (unpublished order under Supreme Court Rule 23).

¶ 4    Prior to trial, the trial court granted the State's motion to admit evidence regarding a prior sex offense defendant committed on February 22, 1991, for which he pled guilty to aggravated criminal sexual assault and was sentenced to seven years' imprisonment.

¶ 5    At trial, R.F. testified that in August 2002, she was 11 years old and lived in a house with her grandmother, mother, brother, and sister. Defendant was her paternal uncle and mother's close friend, and occasionally spent the night at her home. On August 9, 2002, R.F. was sleeping in a bunk bed with her sister, and defendant entered the room and left the door cracked open behind him. Defendant lifted R.F.'s shirt, unbuttoned and unzipped her pants, put his mouth on her chest, put his hand down her pants, and inserted his fingers in her vagina. R.F. was awake but kept her eyes closed and pretended to sleep.

¶ 6    Defendant shook her shoulders and tried to wake her up. R.F. heard her mother using the bathroom, opened her eyes, and saw defendant leave the room. Her mother entered the room, saw her shirt up, "got upset," and left. R.F. followed her mother and saw her arguing with defendant in

the front room. Defendant left the house, and R.F.'s mother called the police and cried. R.F. told her mother what happened.

¶ 7    After the incident, a doctor examined R.F. and conducted a pap smear. R.F. testified that defendant had done similar things to her on three or four prior occasions, but she did not tell anyone because defendant told her "if [she] said anything, he would go to jail, and [she] would get taken away from [her] family."

¶ 8    On cross-examination, R.F. confirmed that at the time of the incident, her brother and father slept in the basement, she and her sister shared a bedroom, her grandmother slept in another bedroom, her mother slept on the couch in the front room, and defendant slept on a mattress on the floor in the front room. She did not know defendant was the one touching her until she opened her eyes and saw him leaving. She testified that defendant did not ask her to touch him, did not show her "any of his private parts," and never "touched himself" while he touched her. He did not pull down her bra when he lifted her shirt.

¶ 9    When the police arrived on the morning of the incident, R.F. told an officer defendant "touched and sucked" her breast, "[f]elt" and inserted his finger in her vagina, and licked and inserted his tongue in her vagina. R.F. testified that defendant inserted his tongue in her vagina "[t]he time before" in the basement, but not on the date of the incident. R.F. also went to an advocacy center and spoke with caseworker Kari Stelnicki. R.F. told Stelnicki that defendant touched her under her bra. She did not recall telling Stelnicki that defendant touched her vagina over her clothes, or that his fingers "didn't go in." R.F. also told Stelnicki that she was younger than 10 years old when defendant first acted inappropriately toward her in the basement. On that occasion, defendant touched her leg near her knee, touched her chest over her clothes, and told her

if she told anyone, he would go to jail and she would be placed in foster care. Stelnicki asked R.F. if defendant touched her with any part other than his hand and tongue, and R.F. stated he did not.

¶ 10    R.F. thought defendant put his penis in her vagina twice "[t]owards the middle" of "when he was raping [her]." She could not remember the day this occurred but knew it happened in the basement when no one else was home. R.F. told the doctor that defendant raped her but she "meant" with "his fingers and his mouth," and did not say he penetrated her with his penis. She did not tell anyone defendant penetrated her with his penis until two or three days after the incident, when she told her mother. In October 2002, her mother took her back to the doctor and confirmed she was not pregnant.

¶ 11    On redirect examination, R.F. testified she told Stelnicki that defendant used his fingers to touch her "private spot" between her legs and under both her pants and underwear. She also told Stelnicki her "top and bra" were up when he touched her chest with his tongue.

¶ 12    R.F.'s mother, Patricia F., testified that, in August 2002, defendant was her "best friend" and they were "always together," although they did not have a relationship beyond a close friendship. R.F. and her sister shared a bunk bed and both slept on the bottom bunk. On August 9, 2002, at 7:30 a.m., Patricia was on the mattress on the floor in the front room, but was not sleeping well and had a "real bad back." Defendant told her to go into her mother's room. Patricia laid down in her mother's room, and she did not use the bathroom at any point. She "had a real bad feeling," and "[s]omething told [her] to get up and go check on [her] girls." She walked towards R.F.'s bedroom, saw defendant exit, and saw R.F. in the bottom bunk bed with her shirt above her chest and her pants "wide open." R.F. followed Patricia to the front room and asked what was wrong.

Defendant, who was on a mattress watching television, put on a shirt, shoes, and socks, and said, "[I]f I'm going to be accused of something, I'm out of here." He then left.

¶ 13    Five minutes later, defendant called the house phone and told Patricia, "[I]f you're going to accuse me of something, accuse me," and "[I]f you're going to call the police, call the police. Otherwise, I'm walking." Patricia asked what he did to R.F., and defendant stated "he was sucking on her chest and playing with her." Patricia called the police, and she, her mother, and R.F. went to an advocacy center. In November 2005, Patricia received a letter from defendant with a photograph of her children attached and took the mail to the advocacy center.

¶ 14    On cross-examination, Patricia confirmed that she previously told defense counsel and an investigator that it was "impossible for [defendant] to penetrate [her] daughter because his penis is well-endowed." Patricia denied that she ever had sexual relations with defendant and never told her ex-fiance James Victory that she did. On redirect, Patricia testified that she knew defendant was "well endowed" because she was "best friends" with two of defendant's girlfriends, and they "bragged."

¶ 15    Dr. Marjorie Fujara testified as an expert witness in "pediatrics, specifically physical and sexual abuse and also neglect." She testified that on August 9, 2002, she interviewed and evaluated R.F. at the Chicago Children Advocacy Center. R.F. told Dr. Fujara that defendant entered her bedroom to wake her up, "licked her breasts," and inserted his fingers in her "private parts." R.F. said "it" happened three times. Dr. Fujara also physically examined R.F. while Patricia and a medical assistant were present, and she collected the items for the criminal sexual assault (CSA) kit. Dr. Fujara observed evidence of bruising on R.F.'s hymen in two different locations, which was consistent with R.F.'s account that her vagina was penetrated by fingers. Dr. Fujara opined,

based on a reasonable degree of medical and scientific certainty, that her findings during the examination were consistent with "fondling and digital penetration."

¶ 16    On cross-examination, Dr. Fujara confirmed that R.F. did not report defendant inserting his penis in her vagina. She also confirmed she could not conclusively say what caused R.F.'s "hemorrhages" and could not rule out that it was caused by "some other foreign object besides [defendant's] finger." She confirmed it was "possible" the hemorrhages could have been caused by masturbation. Dr. Fujara testified that when an 11-year-old child has had sexual intercourse with a male adult, "[m]ost of the time you see nothing," there are no scars or tears to the hymen, and there is "[n]ot necessarily" bruising.

¶ 17    The State stipulated that a CSA was received from Dr. Fujara, inventoried, and examined. The kit included a blood standard, vaginal swabs, rectal swabs, and "miscellaneous" swabs, as well as a pair of underwear and a "sportslike bra," all collected from R.F. The vaginal and rectal swabs, and stains on the underwear and bra, tested negative for the presence of semen; the vaginal and rectal swabs tested negative for the presence of sperm heads.

¶ 18    Illinois state police forensic scientist Douglas Ridolfi testified as an expert witness in forensic biology. He examined a swab from R.F.'s CSA kit, as well as a blood standard taken from R.F. Ridolfi examined the swabs for the presence of saliva, but the results were inconclusive, though there was "some type of reaction" suggesting there "could be" saliva on the swabs.

¶ 19    Illinois state police forensic scientist Theresa Bogard testified as an expert in forensic DNA analysis. She examined a blood standard from defendant and a blood standard and the "miscellaneous" swabs from R.F. A DNA analysis of R.F.'s swabs returned a "full male profile." That profile was consistent with having originated from defendant.

¶ 20    Assistant state's attorney Celeste Stack testified that on February 22, 1991, she went to a police station, and Mirandized and interviewed defendant regarding another child sex abuse case. In that case, defendant gave a statement, which the State entered into evidence. In the statement, defendant admitted to penetrating the victim's vagina with his finger.

¶ 21    The State entered into evidence by stipulation the birth certificates of defendant and R.F., which showed defendant's date of birth was March 25, 1973, and R.F.'s date of birth was in October 1990.

¶ 22    Defendant called James Victory, who testified that in 2002, he was convicted of residential burglary and had been convicted of other offenses prior to that. In March 2004, he entered into a relationship with Patricia. After they first "were intimate," Patricia told him that "she took all me in her," but she could not do that with defendant because he is "very well-endowed." Patricia said that she and defendant "started out as smoking buddies," which "led into other things," and they had been intimate "numerous" times and were in a relationship for several years.

¶ 23    Dora Haynes testified that she and defendant had a physical relationship for 5 years, had known each other for 12½ years, and had a son together. She knew Patricia and R.F. because she would sometimes drive defendant and her son to their house. R.F. and her sister would be "very excited" to see them when they arrived and would run towards the car yelling, " 'Uncle Stanley and [Haynes's son are] here.' " Haynes saw no evidence that R.F. was afraid of, or argued with, defendant, and R.F. "showed compassion and love, *** as a niece would to an uncle."

¶ 24    The jury found defendant guilty of predatory criminal sexual assault, criminal sexual assault, and aggravated criminal sexual abuse. The court merged defendant's criminal sexual assault count into his predatory criminal sexual assault count, and sentenced him to a term of

natural life imprisonment for predatory criminal sexual assault and a concurrent term of seven years' imprisonment for aggravated criminal sexual abuse.

¶ 25    We affirmed on direct appeal, over defendant's contention that the trial court improperly admitted evidence of his prior sex offense to show propensity. *People v. Yurgaitis*, No. 1-07-1253 (2009) (unpublished order under Supreme Court Rule 23).

¶ 26    Defendant filed a number of *pro se* motions for extension of time to file a postconviction petition. He appealed from the denial of his fourth motion for extension of time, and we dismissed the appeal for lack of jurisdiction, as the denial of the motion was not a final and appealable order. *People v. Yurgaitis*, 2013 IL App (1st) 112119-U.

¶ 27    On September 18, 2012, defendant filed a *pro se* postconviction petition under the Act, alleging, *inter alia*, that counsel on direct appeal provided ineffective assistance by failing to investigate his case, raise "constitutional violations previously raised by trial counsel," and argue the State failed to prove every element of the crimes charged. He further claimed that appellate counsel failed to argue that the evidence was not sufficient to show "any sexual arousal or gratification of the defendant or the accuser."

¶ 28    On December 7, 2012, the circuit court summarily dismissed defendant's petition as frivolous and patently without merit.

¶ 29    Defendant appealed and we granted the parties' agreed motion for summary disposition, entering an order remanding the petition for second-stage proceedings. *People v. Yurgaitis*, 1-13-0376 (2014) (disposition order).

¶ 30    At the second stage, defendant was appointed counsel, which filed a Rule 651(c) certificate but did not amend the petition. On November 8, 2018, the State filed a motion to dismiss

defendant's postconviction petition and counsel responded. On June 12, 2019, the circuit court heard arguments on the motion. The State argued in relevant part that defendant's claims of ineffective assistance by counsel on direct appeal were supported by "simply conclusory remarks," and he failed to demonstrate any objective inaction on the part of his appellate counsel or resulting prejudice.

¶ 31 On March 12, 2020, in the presence of the State and defendant's attorney, the circuit court dismissed defendant's petition, reading its written dismissal order out in open court. The court found defendant was not entitled to an evidentiary hearing as the allegations in the petition were variously not well pled, unsupported by the trial record and documents attached to the petition, or barred by waiver or *res judicata*. It found no ineffective assistance by appellate counsel for failing to raise the meritless claims on direct appeal, noting defendant was not prejudiced thereby as there was no reasonable probability the outcome of the appeal would be different had the claims been raised.

¶ 32 On April 17, 2020, defendant filed a *pro se* notice of appeal, which was timely pursuant to the COVID-19 pandemic extension provided by Illinois Supreme Court Order M.R. 30370.

¶ 33 On appeal, defendant alleges the circuit court erred in dismissing his postconviction petition, where he made a substantial showing that counsel on direct appeal provided ineffective assistance by failing to raise a meritorious reasonable doubt challenge to his convictions.

¶ 34 The Act provides a three-stage method for persons under criminal sentence to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). Defendant's petition was dismissed at the second stage of proceedings, in which counsel is

appointed to represent the defendant if necessary, and the State is permitted to file responsive pleadings. *People v. Edwards*, 197 Ill. 2d 239, 245-46 (2001). At the second stage of postconviction proceedings, "the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* at 246. "[A]ll well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The second stage of postconviction review tests the legal sufficiency of the petition. *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 35    "The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations," as such determinations are made during the evidentiary third stage of postconviction proceedings. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). "An evidentiary hearing is only required when the allegations of the petition, supported by the trial record and accompanying affidavits, make a substantial showing of a violation of a constitutional right." *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 31. We review *de novo* the circuit court's second-stage dismissal of a postconviction petition. *Pendleton*, 223 Ill. 2d at 473.

¶ 36    While normally issues which could have been raised on direct appeal but were not are forfeited, the doctrine of forfeiture does not apply here, as defendant alleges appellate counsel was ineffective for failing to raise his argument on direct appeal. *People v. Coleman*, 168 Ill. 2d 509, 522-23 (1995).

¶ 37    Under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), a criminal defendant is guaranteed the right to effective assistance of counsel. *People v. Cole*, 2017 IL 120997, ¶ 22. To prevail on a claim of ineffective assistance under *Strickland v. Washington*,

466 U.S. 668 (1984), a defendant must demonstrate both "that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." (Internal quotation marks omitted.) *People v. Tate*, 2012 IL 112214, ¶ 19. In order to demonstrate ineffective assistance of counsel at the second stage of postconviction proceedings, the defendant must make "(1) a substantial showing that counsel's performance was objectively unreasonable under prevailing professional norms and (2) a substantial showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. White*, 2021 IL App (1st) 170903, ¶ 35 (citing *Domagala*, 2013 IL 113688, ¶ 36).

¶ 38    The same standard applies to claims of ineffective assistance of trial and of appellate counsel. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Appellate counsel need not brief every conceivable issue on appeal, and does not provide ineffective assistance by refraining from raising issues which, in counsel's judgment, are without merit, unless counsel's appraisal of the merits is "patently wrong." *People v. Easley*, 192 Ill. 2d 307, 328-29 (2000). Unless the underlying issue is meritorious, defendant has suffered no prejudice from counsel's failure to raise it on direct appeal. *Childress*, 191 Ill. 2d at 175.

¶ 39    While a defendant must satisfy both prongs of the *Strickland* test (*People v. Jackson*, 2020 IL 124112, ¶ 90), we may resolve an ineffective assistance claim based on the prejudice prong without considering whether counsel's performance was deficient (*People v. Pulliam*, 206 Ill. 2d 218, 249 (2002)). Proceeding directly to the prejudice prong, we find defendant has not demonstrated prejudice resulting from counsel's failure to challenge the sufficiency of the evidence, as such a challenge would not have been meritorious.

¶ 40 "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 41 We will not retry the defendant when reviewing a challenge to the sufficiency of the evidence. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the evidence before it," or "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 42 Defendant was convicted of predatory criminal sexual assault and aggravated criminal sexual abuse. To establish defendant's guilt of predatory criminal sexual assault, the State was required to show that defendant, who was 17 years of age or older, committed an act of sexual

penetration by inserting his finger in the vagina of R.F., who was under the age of 13, for the purpose of sexual gratification or arousal of defendant or R.F. 720 ILCS 5/12-14.1(a)(1) (West 2000, 2002). To establish defendant's guilt of aggravated criminal sexual abuse, the State was required to prove defendant, who was 17 years of age or over, committed an "act of sexual conduct" when he, for the purpose of sexual arousal or gratification of defendant or R.F., used his mouth to touch the breast of R.F., who was under 13 years old. 720 ILCS 5/12-16(c)(1)(i) (West 2000, 2002).

¶ 43    In the instant case, the State called R.F., who testified that defendant entered the bedroom where she and her sister were sleeping, pulled R.F.'s shirt up, unzipped her pants, placed his mouth on her breast, and inserted his finger in her vagina. R.F. testified that although her eyes were closed while the act occurred, she opened her eyes soon afterward and saw defendant exiting her bedroom. Her mother, Patricia, testified that she was outside R.F.'s bedroom and saw defendant exit. When she went inside, she saw R.F.'s shirt pulled up and her pants undone. She immediately confronted defendant, who quickly left the house. Shortly after leaving, defendant called Patricia, who asked him what he did to R.F. Defendant told Patricia that "he was sucking on [R.F.'s] chest and playing with her." Taking this evidence in the light most favorable to the State as we must, we find it ample to support defendant's convictions.

¶ 44    Defendant's argument that counsel on direct appeal was ineffective for not challenging the sufficiency of the evidence at trial essentially hinges on the jury's determinations that R.F. and Patricia were credible witnesses. He asserts that R.F. inconsistently testified regarding how many times he had previously committed sexual acts against her and how he penetrated her, and therefore cannot be believed as to the charged incident. He also claims that R.F. and Patricia provided

inconsistent accounts, where R.F. testified that Patricia went to the bathroom, but Patricia testified that she went into a bedroom next to R.F.'s room. However, our review of the record shows R.F. and Patricia testified consistently as to the most significant details of the incident. Namely, as we have recounted, R.F. testified that defendant entered her room, lifted her shirt, unzipped her pants, placed his mouth on her breast, inserted his fingers in her vagina, and left as Patricia was nearby. Patricia testified that she saw defendant leave R.F.'s room, and saw R.F.'s shirt up and her pants unzipped. It is well-settled that any minor inconsistencies in the testimony of R.F. and Patricia would not in themselves have created a reasonable doubt. See *People v. DeLuna*, 334 Ill. App. 3d 1, 23-24 (2002).

¶ 45    Further, defendant argues the testimony of R.F. and Patricia cannot be believed because he would not have sexually assaulted R.F. while her mother was in a nearby room, or later admitted to the crimes on the phone. Ultimately, this argument would have failed had it been raised on direct appeal, as it was the role of the jury to determine the credibility of the trial witnesses, not this court (*Williams*, 193 Ill. 2d at 338), and the jury believed these witnesses.

¶ 46    Defendant argues the forensic evidence failed to prove him guilty, but the testimony of R.F. and her mother were sufficient to establish his guilt. See *People v. Williams*, 182 Ill. 2d 171, 192 (1998) ("Proof of physical evidence connecting a defendant to a crime has never been required to establish guilt."); *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (testimony of a single witness, if positive and credible, is sufficient to convict).

¶ 47    Further, R.F. and Patricia's testimony *was* corroborated by expert testimony. Dr. Fujara described her examination of R.F., in which she observed bruising on R.F.'s hymen consistent with her account that she was penetrated by a finger. A forensic scientist further testified that a full

male DNA profile was recovered from a swab in R.F.'s CSA kit, and the profile was consistent with having originated from defendant. The State further submitted evidence that in 1991 defendant had previously penetrated a three-year-old girl's vagina using his finger, and this court has already found the evidence was admissible to show defendant's propensity to commit sex offenses. See *People v. Yurgaitis*, No. 1-07-1253 (2009) (unpublished order under Supreme Court Rule 23).

¶ 48    In sum, because any challenge on direct appeal to the sufficiency of the evidence would have been meritless, we find defendant cannot make the requisite substantial showing that he was prejudiced by appellate counsel's failure to challenge the sufficiency of the evidence on direct appeal. *Childress*, 191 Ill. 2d at 175. Accordingly, where defendant has failed to establish one of the two prongs of his ineffective assistance claim, his claim as a whole must fail, and the circuit court properly dismissed his postconviction petition at the second stage of proceedings. *Jackson*, 2020 IL 124112, ¶ 90.

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 50    Affirmed.